TEXACO, INC., Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

The B. F. GOODRICH COMPANY,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

Nos. 20058, 20061.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 12, 1966.

Decided Sept. 25, 1967.

———◇———

Mr. Milton Handler, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. James O. Sullivan, New York City, was on the brief, for petitioner in No. 20,058.

Mr. Edgar E. Barton, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for petitioner in No. 20,061. Messrs. Stanley L. Temko, Washington, D. C., and Austin M. O'Toole, New York City, also entered appearances for petitioner in No. 20,061.

Mr. Alvin L. Berman, Atty., F. T. C., with whom Mr. James McI. Henderson, Gen. Counsel, F. T. C., was on the brief, for respondent.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and BURGER, Circuit Judge.

BURGER, Circuit Judge:

Eleven years after the issuance of a complaint and sixteen years after an investigation was initiated,[1] this case returns to us from the Federal Trade Commission for the second time; in the interim, following our prior review, the Supreme Court remanded for further consideration. See Texaco, Inc. v. F. T. C., 118 U.S.App.D.C. 366, 336 F.2d 754 (1964), remanded, 381 U.S. 739, 85 S.Ct. 1798 (1965).

In 1956 the Federal Trade Commission brought proceedings against major oil and rubber companies, simultaneously instituted by substantially identical complaints, alleging as an unlawful method of competition prohibited by Section 5 of the Federal Trade Act, 38 Stat. 719 (1914), 15 U.S.C. § 45 (1964), the sales commission method of distributing tires, batteries, and accessories, called the "TBA" plan. Under that plan the tire and rubber companies pay commissions to the oil companies on sales of the tire companies' TBA to the oil companies' dealers. Each complaint paired one of the large tire and rubber product manufacturers and a large oil company with which it had contracted. The pairings were Texaco and B. F. Goodrich, Shell and Firestone, and Atlantic and Goodyear.[2]

(1) *Background.* In 1961 the Commission rendered separate decisions in each of the three TBA cases. In both *Atlantic-Goodyear*[3] and *Shell-Firestone*,[4] the Commission found coercion, unlawful tie-ins, and adverse competitive effects resulting from the TBA sales commission agreements. In contrast, however, the Commission in *Texaco-Goodrich*[5] found no coercion and remanded the case to the Hearing Examiner for additional evidence on anticompetitive effects.[6] One year later the Examiner filed a revised decision in which he added new findings and reached new and contrary conclusions without complying with the Commission's directive to take additional evidence.

Prior to the second decision, because of statements made about the then pending

---

1. The investigation was originally instituted in 1936 but was inactive for many years. Serious investigation was renewed between 1949 and 1951 and from 1951 on all six companies were the subject of a single joint investigation which was completed in 1954. *See Hearings Before Subcommittee No. 1 of the House Select Committee on Small Business on the Organization and Procedures of the Federal Regulatory Commissions and their Effect on Small Business*, 84th Cong., 1st Sess. 447–448 (1956).

2. The pairings were based on the most substantial agreements challenged, although the complaints also challenged the contracts of each respondent with other oil and tire companies not parties to the particular actions.

3. 58 F.T.C. 309 (1961).

4. 58 F.T.C. 371 (1961).

5. 58 F.T.C. 1176 (1961).

6. The Commission's first remand order declared:

The determination of whether Texaco's exercise of such economic power in favor of Firestone and Goodyear under the oil company's sales commission contracts with these rubber companies constitutes an unfair method of competition depends, therefore, upon *the competitive effects* of these sales commission contracts; not upon whether Texaco has exercised its power to implement such contracts through the exercise of overt coercive tactics or by more subtle but equally effective means. 58 F.T.C. at 1178 (emphasis in the original).

Only one member of the Commission who had participated in the 1961 remand for additional evidence was on the Commission when the case came back in 1963; he dissented on the ground that the Examiner had failed to comply with the Commission's remand order. The order had explicitly directed the Examiner to take additional evidence on the sales agreement which the Commission considered indispensable to its disposition of the case.

case by Commission Chairman Paul Rand Dixon to the National Congress of Petroleum Retailers, Inc. in Denver, Colorado, on July 25, 1961, Texaco filed a motion before the Commission that Chairman Dixon withdraw from participating or that he be disqualified. The motion was denied and Chairman Dixon participated in the decision. On April 15, 1963, the Commission affirmed the new conclusions of the Examiner that the agreements were unlawful,[7] but offered no explanation for doing so without the new evidence earlier thought necessary.

On appeal from the second Commission decision this Court in 1964 unanimously held that

> Chairman Dixon's participation in the hearing amounted * * * to a denial of due process which invalidated the order under review. * * * His Denver speech, made before the matter was submitted to the Commission * * plainly reveals that he had already concluded that Texaco and Goodrich were violating the Act * * *.

*Supra* 118 U.S.App.D.C. at 372, 336 F.2d at 760. In the Supreme Court the Solicitor General did not challenge this Court's conclusion of disqualifying bias on the part of the Commission Chairman. With respect to the merits, a majority of this Court held that there had been a fundamental failure of proof. Our opinion stated:

> We see nothing illegal or even unethical in the payment of commissions for such services, *except in instances where an oil marketing company forces its dealers through coercive tactics or controlling economic power to buy the sponsored products. Neither of those influences was proved in this case, and it may not be presumed that either will exist in future similar situations.*

*Id.* at 375, 336 F.2d at 763 (emphasis added). We dismissed the complaint because of this lack of proof and because the undue protraction of the administrative process constituted a denial of due process.

Meanwhile, the Seventh Circuit affirmed the Commission in the *Atlantic* case, Goodyear Tire and Rubber Co. v. F. T. C., 331 F.2d 394 (7th Cir. 1964), and the alleged conflict between this Circuit and the Seventh Circuit was asserted in the petition for certiorari. The writ was subsequently granted.[8]

In Atlantic Refining Co. v. F. T. C., 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965), the Supreme Court affirmed the Seventh Circuit holding that the Atlantic TBA sales commission agreements were an unfair method of competition. One week later in a *per curiam* opinion the Court granted the Commission's petition for a writ of certiorari in *Texaco*, and remanded with instructions

> to remand it immediately to the Federal Trade Commission for further proceedings, without the participation of Chairman Dixon, in light of Atlantic Refining Co. v. Federal Trade Comm[issio]'n, 381 U.S. 357, 85 S.Ct. 1498.

381 U.S. 739, 85 S.Ct. 1798 (1965). Pursuant to the remand from this court, the Commission[9] issued an order on June 18, 1965 (a) vacating its prior 1963 decision, (b) denominating the proceedings before the Commission as appeals from the Examiner's 1962 decision, (c) permitting oral argument and the filing of briefs, and (d) instructing counsel to "focus on the question whether the facts of record in the present case bring it within the Supreme Court's decision in the *Atlantic*

---

7. B. F. Goodrich Co., Docket No. 6485, 62 F.T.C. 1172, 1197 (1963).

8. The *Shell-Firestone* proceedings before the Fifth Circuit had been held in abeyance pending the Supreme Court resolution of the alleged conflict in circuits.

9. Chairman Dixon, having been disqualified did not participate nor did Commissioner MacIntyre. Thus only three Commissioners have participated in the opinion and order now under review. None of the three members participating were members of the 1961 Commission which directed the Examiner to take additional evidence on the competitive effects of the sales commission contracts.

*Refining Co.* case." *Order of the Federal Trade Commission Vacating Prior Decision and Order and Setting Hearing on Remand,* In the Matter of The B. F. Goodrich Co. and The Texas Co., Docket No. 6485, June 18, 1965.

In January, 1966, the Commission entered an order and filed an opinion, which is the subject of this appeal. The Commission held:

> In our view the Supreme Court's decision in *Atlantic* compels the conclusion that the Texaco-Goodrich plan is an unfair method of competition and that Texaco and Goodrich, as were Atlantic and Goodyear, should be prohibited from performing or entering into any other sales commission plans.

The Commission thus held that the sales commission agreement involved here was indistinguishable in fundamental operation and effect from the one held unlawful in *Atlantic.*

(2) *Contentions.* The Commission contends that (1) the TBA sales commission system is inherently unlawful without regard to any acts of overt coercion and argues that this is implicit in the remand in light of *Atlantic;* (2) by its use of the sales commission system, Texaco has in fact exercised its economic power over its dealers in favor of Goodrich sponsored products; and (3) the sales commission system has given Goodrich an unfair competitive advantage.

Texaco's position is (1) that the coercion provision of the Commission's latest order entered against Texaco is not justified on the record; (2) that this order is erroneous independent of the sales commission program; and (3) that the Supreme Court's remand to the Commission required that the asserted illegality of Texaco's sales commission program be redetermined in light of *Atlantic;* furthermore, that illgality under the *Atlantic* holding can be shown only by proof that Texaco coerced dealers to purchase sponsored merchandise and that anticompetitive effects followed. Additionally, Texaco contends that the administrative process has been abused by the unduly long drawn out nature of the proceedings and that this constitutes harassment and warrants dismissal of the proceedings independent of the merits.

We must now determine whether the Commission has complied with the remand order and correctly applied the applicable principles enunciated in the *Atlantic* holding.

(3) *The Atlantic Holding.* Our analysis must begin with the decision in *Atlantic.* In the *Shell-Firestone* case, the third TBA case decided after *Atlantic,* the Fifth Circuit interpreted the *Atlantic* rationale as based on three essential components, the application of each depending on the facts of the particular case before the court:

(a) the oil company's dominant economic power over its dealers;

(b) exercise of that power over its dealers;

(c) anticompetitive effects of using that power.

Shell Oil Co. v. F. T. C., 360 F.2d 470, 477 (5th Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 541 (1967). Both the Commission and Texaco agree with this view of the *Atlantic* holding and this view was essentially adopted by the Solicitor General in the Supreme Court. Our consideration of *Atlantic* leads us to the same view as that of the Fifth Circuit in *Shell;* in short we conclude with Judge Wisdom that the Court hovered near the brink but did not lay down a per se rule.[10]

---

10. Several factors compel this conclusion. In the first place, although the Commission took the position that the sales commission contract was illegal *per se,* the Seventh Circuit implicitly rejected such a view, and the absence of the words, "*per se*" in the *Atlantic* opinion "could hardly have been an accident." *Shell, supra* at 477.

Secondly, the Court has stated that when it has had no previous opportunity to assay the effects on competition of a new form of economic activity, it will not declare that activity illegal *per se.* White Motor Co. v. United States, 372 U.S. 253, 261, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) ; *see also* Mr. Justice Goldberg's dissenting opinion in *Atlantic,* 381

(a) *Existence of Dominant Economic Power.*

In our prior opinion we found "no basis in the record for the Commission's conclusion that Texaco has controlling economic power over its dealers," supra 118 U.S.App.D.C. at 374, 336 F.2d at 762. In *Atlantic* the Court viewed the question of dominant economic power not only in terms of the statistical facts used to show economic dependence but also in terms of specific control devices: (1) control over oil and gas supply; (2) control over dealers through short term leases, equipment loans, etc.; (3) control over advertising; (4) leverage from financial promotion; and (5) housekeeping requirements of leases. Such devices have often been alluded to in demonstrating dominant economic power and leverage. *See, e. g.,* Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); United States v. Loew's, Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962).

■ While the statistical material in the record here is ambiguous, the record fairly demonstrates what is a matter of common acceptance, that both Texaco and B. F. Goodrich are among the giants of their respective industries,[11] and as such control large economic leverage.

Many, but not all, of the control devices mentioned in *Atlantic* are present to some degree here. Texaco, of course, controls the supply of oil and gas to its dealers, and the relatively heavy cost of constructing and maintaining a modern service station enables Texaco to maintain substantial economic leverage through the use of loans, short-term leases, and equipment financing. However, we agree with Judge Wisdom that "the dominance of a major oil company over its dealers comes from the leverage inherent in the structure and economics of the petroleum distribution system * * *." 360 F.2d at 481.

(b) *Exercise of Dominant Economic Power.*

In our earlier opinion we concluded that on the whole record there was no substantial evidence that Texaco had exercised controlling economic power over its dealers, as the Commission had found. Similarly, after careful review of the record, we had concluded that there was no basis for a finding of coercion and that read as a whole the record demonstrated the contrary. We should note at the outset that nothing said by the Supreme Court in *Atlantic* bears on that holding and nothing said by the Commission since the remand alters that conclusion.

■ We can glean nothing from the utterances of the Supreme Court which alters the basic rule that a finding of coercion is the threshold requirement of a determination of exercise of dominant economic power. As the Commission has

U.S. at 389–390, 85 S.Ct. 1498, 14 L.Ed. 2d 443. *But cf.* United States v. Arnold, Schwinn & Co., 388 U.S. 365, 385, 386, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) (Stewart, J., concurring in part and dissenting in part).

11. The myriad figures present in our voluminous record support a statistical analysis which assumes dominant economic power. Similar statistics have been fully discussed in the *Shell* case. 360 F.2d at 479–482 & nn. 21–23.

We think it is sufficient to note the following facts: Goodrich is one of our largest rubber product manufacturers and its sales in 1954, one of the years on which the complaint is based, exceeded $500 million dollars. Texaco sales in the same year exceeded one and one-half billion dollars. The 30,000 Texaco stations which might be subject to the sales commission plan constituted some 16.5% of all service stations in the United States. Finally, from 1952 to 1956 Goodrich sales to all Texaco accounts rose from 12.7 million dollars to 18.9 million dollars. We think these not-insubstantial figures sufficiently support the requirements of a statistical analysis of dominant economic power.

We should make clear, however, our view that statistics alone would not be sufficient to support the finding that Texaco exercises dominant economic power. The statistical record supports our conclusion that the Commission has not set forth with sufficient clarity an adequate statistical record to sustain its other findings.

noted, it did not ask the Supreme Court to review our holding that the record did not sustain a finding of coercion. Equally true is the fact that in the *Atlantic* case the Seventh Circuit's sustaining of the Commission's findings of coercion were not appealed. But, in spite of this lack of challenge by Atlantic and by the Commission in both cases; the Supreme Court in *Atlantic* did not ignore record evidence of Atlantic's coercive conduct. Indeed, that Court was well aware that the coercion was found to have permeated the entire Atlantic program, contaminating even its neutral conduct.

The Commission argues that Atlantic's coercion merely aggravated the restraint imposed by the sales commission plan. We do not so read *Atlantic*. If the Supreme Court concluded that the sales commission plan was inherently illegal when entered into by a major oil company, it would have had no occasion to take cognizance of the coercive practices and no remand of this case would have been required. Yet the *Atlantic* opinion is replete with references to these practices and we cannot escape the conclusion that the overt coercive acts practiced by Atlantic were deemed essential to the ultimate action of the Court. It is surely of some significance that in almost every page of the *Atlantic* opinion there is some such reference, *e. g.*, "overt acts," "overt coercive pressures," "direct and overt threats," etc., 381 U.S. at 368, 373, 376, 85 S.Ct. 1498.

The Commission now asserts that since it did not rely upon coercion as a basis for invalidating Texaco's sales commission agreements, the Supreme Court action vacating our judgment implies a total rejection of Texaco's position. The combination of *Atlantic's* emphasis on overt coercion, to which we have just alluded, the failure of the Commission to challenge our prior holding on this issue when seeking review, and the absence of any reference to the subject in the Supreme Court Per Curiam opinion on remand all tend strongly to negate the Commission's argument. Had the Commission urged on the Supreme Court a *per se* rule of il-

legality stemming from mere existence of economic power, its failure to challenge our holding on absence of coercion would be understandable.

We have difficulty reconciling the Commission argument with the fact of a remand in this case. If the Supreme Court viewed its holding in *Atlantic* as treating contractual arrangements between the oil company and its dealers in and of themselves as giving rise to controlling economic power, and that mere salesmanship without any coercion constituted unlawful exercise of such power, there would have been nothing to remand. The Supreme Court could have simply reversed and reinstated the Commission's order.

Of course we realize, as did Judge Wisdom in *Shell*, that the "Company's use of its economic power through the sales commission plan to cause its dealers to buy sponsored TBA *even in the absence of overt coercion*" can constitute an unfair method of competition and a violation of section 5, *Shell* at 482–483 (emphasis added). The Commission also recognizes this and therefore argues that each of the "non-coercive practices" referred to in *Atlantic* are present in equal degree in this case. The Commission argues that the references to these practices in *Atlantic* compels a conclusion that even the non-coercive practices arising from the contractual relationship constitute the exercise of economic power over dealers. The Commission's contentions must be weighed against the Examiner's finding that Texaco dealers, unlike those of Atlantic and Shell, were free to accept or reject sponsored products. This view of the Examiner may have been influenced by the circumstance that only 5 former Texaco dealers testified to facts which would sustain a finding of coercive practices and more than 50 present and some former dealers testified to the contrary.

In light of all this we do not read *Atlantic* to conclude that the Court was condemning these practices as *per se* illegal. They were indicative of Atlantic's conduct, of a character not shown in this

record, of marshalling "its full economic power in a continuing campaign to force its dealers and wholesalers to buy Goodyear products," 381 U.S. at 371, 85 S.Ct. at 1507. A few examples will suffice:

(1) *Sales Practices.* In *Atlantic,* the oil company

> was to instruct its salesmen to urge dealers to "vigorously" represent Goodyear, and to "cooperate with and assist" Goodyear in its "efforts to promote and increase the sale" by Atlantic dealers of Goodyear products.

381 U.S. at 365, 85 S.Ct. at 1504. The Commission characterizes the evidence here as substantially identical. Yet the Examiner was satisfied that Texaco policy since at least 1948 has been to permit each dealer to choose whatever brand TBA he desires.[12]

The Commission now argues that "on each visit, the [Texaco] salesman offers to write up sponsored TBA orders," but the Commission itself in the order presently under review struck the Examiner's finding that Texaco "salesmen were encouraged by [Texaco] management to write up orders for sponsored TBA without waiting for a formal request from a dealer."

(2) *Dual Solicitation and Advance Notification.* In *Atlantic* there was a regular practice of

> "double teaming" solicitation of Atlantic outlets by representatives of both companies to convert them to Goodyear products. They were to call on the dealers together, take stock orders, furnish initial price lists and project future quotas of purchases of Goodyear products.

381 U.S. at 365, 85 S.Ct. at 1504. The Commission contends such practices are prevalent in this record. The Examiner found that "double teaming" and advance solicitation—notice to the tire companies that a new station was about to become operable—were isolated and sporadic practices, not a regular or even frequent practice as was the case with Atlantic's operations. They appeared in *Atlantic* in the context of an entire system designed to overtly coerce its dealers. This is not the state of the record before us.

(3) *Dealer Policing and Credit Cards.* In *Atlantic* the Supreme Court was confronted with evidence that Atlantic imposed quotas on dealers and effectively policed them by the use of a reporting system of purchases and sales of TBA. In the original appeal to this Court, the Commission contended that the quota and policing system were also used by Texaco. In the present appeal the Commission has retreated from this position. As to credit card policy, the Examiner carefully distinguished the *Atlantic* record from the instant record and significantly found that Texaco does permit dealers to charge *non-sponsored* TBA on its credit cards.[13]

(4) *Geographical Supply Points.* In *Atlantic,* Goodyear required that Atlantic assign its dealers to a single point of TBA supply. This geographical division of supply points is not present in our rec-

---

12. This policy in part states:

The Texas Company's selling personnel are expected to become familiar with Firestone and Goodrich Inventory Guide Systems and TBA merchandise and the merchandising of TBA products generally. But it should be clearly understood that we will render equal assistance to all dealers in setting up and maintaining his own basic TBA stock assortment and Inventory Guide system along these lines regardless of the brand of merchandise handled. * * * [The Inventory Guide] is not to be applied in any manner whatsoever that would impair any dealer's freedom to purchase such brands and quantities of TBA merchandise as he desires.

Our dealers, consignees and distributors are independent businessmen, and instructions that no undue influence is to be used to interfere with their free and independent judgment remain unchanged.

13. Since 1955 Texaco practice is to permit deferred payment of sponsored TBA on credit. Thus, three months is permitted on purchases of $30 or more, six months on purchases of $50 or more. The Examiner held that this limitation of deferred payment to sponsored TBA was altogether reasonable and proper. But the record also shows that dealers continue to charge non-sponsored TBA on a monthly basis without a dollar limitation.

ord and, indeed, the Examiner found that as to sponsored TBA sales, each dealer did not buy exclusively from, and was not limited to, any particular supply point but was free to deal with any source he chose.

These few examples demonstrate a different set of facts between the *Atlantic* record and this case. On the basis of the record before us we cannot conclude that Texaco exploited its service station market illegally for the benefit of itself and Goodrich. In short, we do not find that Texaco used its controlling economic power to compel its dealers to purchase sponsored TBA.

(c) *Anticompetitive Effects.*

██ *Atlantic's* third requirement for finding a violation of section 5 is that the TBA sales commission contracts must result in adverse competitive effects on the relevant market. As we have previously noted, the first Commission remand of the case to the Examiner in 1961 was because of the need for additional evidence on the issue of anticompetitive effects. We have further noted that no such evidence was forthcoming. In our prior review of this case we also found that evidence of anticompetitive effects was lacking.

The Commission urges the following three guidelines to be the essence of the *Atlantic* holding on anticompetitive effects:

(1) Extensive economic analysis of the competitive effect based on examination of the entire TBA market is unnecessary.

(2) Evidence of economic justification or benefit to the parties concerned is immaterial.

(3) It is sufficient when the Commission finds that a substantial portion of commerce is affected.

This, of course, explains the Commission position that the TBA system is an "inherently anticompetitive" device from which "competitive injury must result." This is simply a renewed intimation of a

*per se* rule in *Atlantic* and needs little discussion since we have already rejected that reading. It is true, of course, that the guidelines suggested by the Commission are referred to in the *Atlantic* opinion, *e. g.,* 381 U.S. at 370–371, 85 S.Ct. at 1498. But it is also true, as Judge Wisdom pointed out in his discussion of these guidelines, that the Court in *Atlantic* looked to the full record for examples of anticompetitive effects. 360 F.2d at 483. Indeed, the Court was very clear on this point:

> The anticompetitive effects of this program are clear on the record and render unnecessary extensive economic analysis of market percentages or business justifications * * *.

381 U.S. at 371, 85 S.Ct. at 1507.

Bearing in mind the Fifth Circuit's caveat of an overlap between a discussion of anticompetitive effects and the exercise of dominant economic power, we proceed to examine the record before us. As *Atlantic* noted, the question is whether the TBA system "impaired competition at three levels [manufacturing, wholesaling, and retailing] of the tires, batteries and accessories industry," *id.* at 370, 85 S.Ct. at 1506. And, of course, it goes without saying that the type of competition at these levels—interbrand and intrabrand —is highly relevant.

(a) *Interbrand Competition.*

Under the TBA system interbrand competition manifests itself, if at all, most perceptively at the wholesale level. We recognize that wholesalers of competing TBA brands may well be substantially limited in selling their products to service stations under contract with major oil companies. The TBA system may deprive retailers of their freedom of choice as to the TBA products they may choose. Such competitive effects also reach back to the manufacturing level. For example, to the extent that wholesalers are unable to sell their products to service outlets, the manufacturers may suffer injury. To that extent producers'

distribution systems may be impaired and expansion potential circumscribed.[14]

As an example of interbrand anticompetitive effects in *Atlantic* the Court found a classic division of territories between Goodyear and Firestone, the two manufacturers involved: "Firestone and Goodyear were excluded from selling to Atlantic's dealers in each other's territories," 381 U.S. at 370, 85 S.Ct. at 1506. Flowing directly from this was the further adverse effect that Atlantic dealers could only buy at the prices designated by the supplier to whom the territory had been allocated, *ibid.* Finally, there was little doubt that the combination of these and other practices in the *Atlantic* record, including the resort to overt coercion, had the drastic anticompetitive effect of almost completely foreclosing the market to Atlantic's own retailers and wholesalers who desired to sell brands other than sponsored products and to wholesalers and manufacturers of competing brands with similar desires.

We have earlier noted the fact that the record before us is devoid of evidence disclosing any form of territorial division of markets on the part of the sponsored manufacturers. And we have also referred to the long standing Texaco policy that Texaco dealers are free to purchase any brand of TBA which they desire to sell. *See* note 12, *supra*. Similarly, there is no evidence that any form of price dictation occurred.

But the most significant evidence on the question of interbrand anticompetitive effects concerns the testimony of Texaco dealers and sponsored and competing suppliers. The Commission relies upon testimony of former Texaco dealers and competing TBA suppliers to the effect that nonsponsored TBA could not be sold to Texaco dealers because of the dealers' understanding that they were required to purchase sponsored TBA. The Commission corroborates this testimony with "representative evidence" that in certain Texaco districts the percentage of dealers who carried sponsored TBA ranges from 70% to 98%. This evidence and these figures were rejected by the Examiner in his original decision and by the first Commission decision. The Examiner's modification of this position, which as we noted was made with no new evidence, was affirmed by the second Commission decision, and this Court rejected those findings on the prior appeal as unsupported in the record. Nothing has developed to change our view, and indeed on remand the Commission has stricken the Examiner's finding. The Commission now limits its characterization of the testimony of competing suppliers to a statement that "practically all of the representatives of the competitors of Goodrich *called as witnesses* testified" that they were foreclosed from the Texaco service station market. We simply cannot regard this as "representative;" such a conclusion is not supported by substantial evidence, except in isolated instances which were generally contradicted by overwhelming rebuttal evidence. Nor can we accept the Commission view that the rebuttal testimony is to be discounted because witnesses are under "pressure" from Texaco. A finding of pressure on witnesses before a tribunal is not one to be lightly inferred and ought not be made without evidence of some kind; none is suggested by the Commission on this score.

(b) *Intrabrand Competition*

A second form of competition, intrabrand, is the inevitable result of the supply point system noted in *Atlantic*. The adverse anticompetitive effects are similar to those found in interbrand competition—pricing, territorial market foreclosure, and full-line forcing.[15]  Without

14. *See* Klaus, *Analysis of the Sales-Commission System of Tires, Batteries, and Accessories Distribution in Retrospect: Answers For An Incisive Dissent*, 44 TEXAS L.REV. 890, 911 (1966).

15. In the *Atlantic* case the Seventh Circuit had found that

> [B]oth Goodyear and Firestone said that they would refuse to sell only tires under the sales commission plan and insisted that they be allowed to handle batteries and accessories as well as their own products.
> 331 F.2d at 398.

laboring the point, we have already noted that the record in the instant case simply cannot be said to reflect substantial evidence to support a finding that these practices exist in a measure adequate to demonstrate that the Texaco TBA contract causes adverse anticompetitive effects. We therefore hold that there is an absence of substantial evidence which supports a finding of anticompetitive effects.

■ The Commission maintains that the first Commission opinion remanding for evidence of anticompetitive effects was "enigmatic," and that it is enough that a substantial portion of commerce is affected under the rationale of *Atlantic*. Surely there is nothing obscure or ambiguous in a remand predicated on an absence of crucial evidence especially where the remand directs a further inquiry for relevant evidence. And we find no basis for treating the *Atlantic* case as carrying the test of quantitative substantiality to the brink of extremism by a strained literalism. Indeed, we are inclined to believe that the Commission views the situation, as the Commission opinion and brief candidly concede, as one in which it would be arbitrary and inequitable to bar Atlantic and Shell, who are very much like Texaco in broad outline, from use of the sales commission plan while permitting Texaco to continue its operation. We agree that it would be inequitable, and indeed a dereliction of the Commission's obligations, *provided* that all three were

guilty of substantially equal violations of section 5. But simply because Texaco is in the same line of business does not mean it must suffer the pain of the misdeeds of other oil companies; this would indeed be guilt by association. We conclude that the record simply does not support a finding that Texaco violated the Act. We therefore hold that while the record shows Texaco indeed has dominant economic power, it is fatally deficient on the crucial issues of exercise of that power and subsequent anticompetitive effects.

CONCLUSION

One course available to us would be to remand this case once again to the Commission to permit it to develop additional evidence for the record [16] but the Commission and Examiner have had abundant opportunity—and direct mandate—to do this in the past and have not done so. We think the time has now come to terminate these protracted proceedings and dismiss the complaint. We recognize that the Commission's obligations and the public interest in preserving competition are not to be lightly dealt with but the Commission has now had more than an adequate opportunity to develop a record in support of its section 5 contentions over a period of fourteen years. Accordingly, the Commission order under review is set aside and remanded to the Commission with directions to dismiss the complaint.

Reversed and remanded.

---

16. Even in a remand to the Commission for further proceedings it would have been imperative to make clear our view that the coercion aspect of the Commission order has no basis in law, or the record. Since we have twice determined

there is no basis that Texaco overtly coerced any substantial number of dealers or that a pattern of coercion existed, the provisions of the order prohibiting such coercion were and are baseless.