# FEDERAL TRADE COMMISSION *v.*
# TEXACO INC. ET AL.

No. 24.   Argued November 13, 1968.—Decided December 16, 1968.

*Daniel M. Friedman* argued the cause for petitioner. On the brief were *Solicitor General Griswold, Assistant Attorney General Turner, Lawrence G. Wallace, James McI. Henderson,* and *Alvin L. Berman.*

*Milton Handler* and *Edgar E. Barton* argued the cause for respondents. With them on the brief were *Stanley D. Robinson* and *Macdonald Flinn.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The question presented by this case is whether the FTC was warranted in finding that it was an unfair method of competition in violation of § 5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. § 45, for respondent Texaco to undertake to induce its service station dealers to purchase Goodrich tires, batteries, and accessories (hereafter referred to as TBA) in return for a commission paid by Goodrich to Texaco. In three related proceedings instituted in 1961, the Commission challenged the sales-commission method of distributing TBA and in each case named as a respondent a major oil company and a major tire manufacturer. After extensive hearings, the Commission concluded that each of the arrangements constituted an unfair method of competition and ordered each tire company and each oil company to refrain from entering into any such commission arrangements. In one of these cases, *Atlantic Refining Co.* v. *FTC,* 381 U. S. 357 (1965), this Court affirmed the decision of the Court of Appeals for the Seventh Circuit sustaining the Commission's order against Atlantic Refining Company and the Goodyear Tire & Rubber Company. In a second case, *Shell Oil Co.* v. *FTC,* 360 F. 2d 470, cert. denied, 385 U. S. 1002, the Court of Appeals for the Fifth Circuit, following this Court's decision in *Atlantic,* sustained the Commission's order against the Shell Oil Company and the Firestone Tire & Rubber

Company. In contrast to the decisions of these two Courts of Appeals, the Court of Appeals for the District of Columbia Circuit set aside the Commission's order in this, the third of the three cases, involving respondents Goodrich and Texaco. 118 U. S. App. D. C. 366, 336 F. 2d 754 (1964).[1] The Commission petitioned this Court for review and, one week following our *Atlantic* decision, we granted certiorari and remanded for further consideration in light of that opinion. 381 U. S. 739 (1965). The Commission, on remand, reaffirmed its conclusion that the Texaco-Goodrich arrangement, like that involved in the other two cases, violated § 5 of the Federal Trade Commission Act. The Court of Appeals for the District of Columbia Circuit again reversed, this time holding that the Commission had failed to establish that Texaco had exercised its dominant economic power over its dealers or that the Texaco-Goodrich arrangement had an adverse effect on competition. 127 U. S. App. D. C. 349, 383 F. 2d 942. We granted certiorari to determine whether the court below had correctly applied the principles of our *Atlantic* decision. 390 U. S. 979.

Congress enacted § 5 of the Federal Trade Commission Act to combat in their incipiency trade practices that exhibit a strong potential for stifling competition. In large measure the task of defining "unfair methods of competition" was left to the Commission. The legislative history shows that Congress concluded that the best check on unfair competition would be "an administrative

---

[1] The sales-commission arrangement between Texaco and the Firestone Tire & Rubber Company was also the subject of Commission action. Firestone is not a respondent in this action, however, since it is already subject to a final order of the Commission prohibiting its use of a sales-commission plan with any oil company. See *Shell Oil Co.* v. *FTC*, 360 F. 2d 470, 474 (C. A. 5th Cir.), cert. denied, 385 U. S. 1002.

body of practical men . . . who will be able to apply the rule enacted by Congress to particular business situations, so as to eradicate evils with the least risk of interfering with legitimate business operations." H. R. Conf. Rep. No. 1142, 63d Cong., 2d Sess., 19. *Atlantic Refining Co. v. FTC*, 381 U. S. 357, 367. While the ultimate responsibility for the construction of this statute rests with the courts, we have held on many occasions that the determinations of the Commission, an expert body charged with the practical application of the statute, are entitled to great weight. *FTC* v. *Motion Picture Advertising Serv. Co.*, 344 U. S. 392, 396 (1953); *FTC* v. *Cement Institute*, 333 U. S. 683, 720 (1948). This is especially true here, where the Commission has had occasion in three related proceedings to study and assess the effects on competition of the sales-commission arrangement for marketing TBA. With this in mind, we turn to the facts of this case.

The Commission and the respondents agree that the Texaco-Goodrich arrangement for marketing TBA will fall under the rationale of our *Atlantic* decision if the Commission was correct in its three ultimate conclusions (1) that Texaco has dominant economic power over its dealers; (2) that Texaco exercises that power over its dealers in fulfilling its agreement to promote and sponsor Goodrich products; and (3) that anticompetitive effects result from the exercise of that power.

That Texaco holds dominant economic power over its dealers is clearly shown by the record in this case. In fact, respondents do not contest the conclusion of the Court of Appeals below and the Court of Appeals for the Fifth Circuit in *Shell* that such power is "inherent in the structure and economics of the petroleum distribution system." 127 U. S. App. D. C. 349, 353, 383 F. 2d 942, 946; 360 F. 2d 470, 481 (C. A. 5th Cir.). Nearly 40% of the Texaco dealers lease their stations from Texaco.

These dealers typically hold a one-year lease on their stations, and these leases are subject to termination at the end of any year on 10 days' notice. At any time during the year a man's lease on his service station may be immediately terminated by Texaco without advance notice if in Texaco's judgment any of the "housekeeping" provisions of the lease, relating to the use and appearance of the station, are not fulfilled. The contract under which Texaco dealers receive their vital supply of gasoline and other petroleum products also runs from year to year and is terminable on 30 days' notice under Texaco's standard form contract. The average dealer is a man of limited means who has what is for him a sizable investment in his station. He stands to lose much if he incurs the ill will of Texaco. As Judge Wisdom wrote in *Shell*, "A man operating a gas station is bound to be overawed by the great corporation that is his supplier, his banker, and his landlord." 360 F. 2d 470, 487.

It is against the background of this dominant economic power over the dealers that the sales-commission arrangement must be viewed. The Texaco-Goodrich agreement provides that Goodrich will pay Texaco a commission of 10% on all purchases by Texaco retail service station dealers of Goodrich TBA. In return, Texaco agrees to "promote the sale of Goodrich products" to Texaco dealers. During the five-year period studied by the Commission (1952–1956) $245,000,000 of the Goodrich and Firestone TBA sponsored by Texaco was purchased by Texaco dealers, for which Texaco received almost $22,000,000 in retail and wholesale commissions. Evidence before the Commission showed that Texaco carried out its agreement to promote Goodrich products through constantly reminding its dealers of Texaco's desire that they stock and sell the sponsored Goodrich TBA. Texaco emphasizes the importance of TBA and the recommended brands as early as its initial interview

with a prospective dealer and repeats its recommendation through a steady flow of campaign materials utilizing Goodrich products. Texaco salesmen, the primary link between Texaco and the dealers, promote Goodrich products in their day-to-day contact with the Texaco dealers. The evaluation of a dealer's station by the Texaco salesman is often an important factor in determining whether a dealer's contract or lease with Texaco will be renewed. Thus the Texaco salesmen, whose favorable opinion is so important to every dealer, are the key men in the promotion of Goodrich products, and on occasion accompany the Goodrich salesmen in their calls on the dealers. Finally, Texaco receives regular reports on the amount of sponsored TBA purchased by each dealer. Respondents contend, however, that these reports are used only for maintaining Texaco's accounts with Goodrich and not for policing dealer purchases.

Respondents urge that the facts of this case are fundamentally different from those involved in *Atlantic* because of the presence there, and the absence here, of "overt coercive practices" designed to force the dealers to purchase the sponsored brand of TBA. We agree, as the Government concedes, that the evidence in this case regarding coercive practices is considerably less substantial than the evidence presented in *Atlantic*. The *Atlantic* record contained direct evidence of dealers threatened with cancellation of their leases, the setting of dealer quotas for purchase of certain amounts of sponsored TBA, the requirement that dealers purchase TBA from single assigned supply points, refusals by Atlantic to honor credit card charges for nonsponsored TBA, and policing of Atlantic dealers by "phantom inspectors." While the evidence in the present case fails to establish the kind of overt coercive acts shown in *Atlantic,* we think it clear nonetheless that Texaco's dominant eco-

nomic power was used in a manner which tended to foreclose competition in the marketing of TBA. The sales-commission system for marketing TBA is inherently coercive. A service station dealer whose very livelihood depends upon the continuing good favor of a major oil company is constantly aware of the oil company's desire that he stock and sell the recommended brand of TBA. Through the constant reminder of the Texaco salesman, through demonstration projects and promotional materials, through all of the dealer's contacts with Texaco, he learns the lesson that Texaco wants him to purchase for his station the brand of TBA which pays Texaco 10% on every retail item the dealer buys. With the dealer's supply of gasoline, his lease on his station, and his Texaco identification subject to continuing review, we think it flies in the face of common sense to say, as Texaco asserts, that the dealer is "perfectly free" to reject Texaco's chosen brand of TBA. Equally applicable here is this Court's judgment in *Atlantic* that "[i]t is difficult to escape the conclusion that there would have been little point in paying substantial commissions to oil companies were it not for their ability to exert power over their wholesalers and dealers." 381 U. S., at 376.

We are similarly convinced that the Commission was correct in determining that this arrangement has an adverse effect on competition in the marketing of TBA. Service stations play an increasingly important role in the marketing of tires, batteries, and other automotive accessories. With five major companies supplying virtually all of the tires that come with new cars, only in the replacement market can the smaller companies hope to compete. Ideally, each service station dealer would stock the brands of TBA that in his judgment were most favored by customers for price and quality. To the extent that dealers are induced to select the sponsored brand in order to maintain the good favor of the oil

company upon which they are dependent, the operation of the competitive market is adversely affected. As we noted in *Atlantic,* the essential anticompetitive vice of such an arrangement is "the utilization of economic power in one market to curtail competition in another." 381 U. S. 357, 369. Here the TBA manufacturer has purchased the oil company's economic power and used it as a partial substitute for competitive merit in gaining a major share of the TBA market.[2] The nonsponsored brands do not compete on the even terms of price and quality competition; they must overcome, in addition, the influence of the dominant oil company that has been paid to induce its dealers to buy the recommended brand. While the success of this arrangement in foreclosing competitors from the TBA market has not matched that of the direct coercion employed by Atlantic, we feel that the anticompetitive tendencies of such a system are clear, and that the Commission was properly fulfilling the task that Congress assigned it in halting this practice in its incipiency. The Commission is not required to show that a practice it condemns has totally eliminated competition in the relevant market. It is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce. *International Salt Co.* v. *United States,* 332 U. S. 392 (1947); *United States* v. *Loew's, Inc.,* 371 U. S. 38, 45, n. 4 (1962); *Atlantic Refining Co.* v. *FTC,* 381 U. S. 357, 371 (1965).

The Commission was justified in concluding that more than an insubstantial amount of commerce was involved.

---

[2] The Commission's conclusion that under a sales-commission plan, a dealer would not make his choice solely on the basis of competitive merit was bolstered by the testimony of 31 sellers of competing, nonsponsored TBA that they were unable to sell to particular Texaco stations because of the dealers' concern that Texaco would disapprove of their purchase of nonsponsored products.

Texaco is one of the Nation's largest petroleum companies. It sells its products to approximately 30,000 service stations, or about 16.5% of all service stations in the United States. The volume of sponsored TBA purchased by Texaco dealers in the five-year period 1952–1956 was $245,000,000, almost five times the amount involved in the *Atlantic* case.

For the reasons stated above, we reverse the judgment below and remand to the Court of Appeals for enforcement of the Commission's order with the exception of paragraphs five and six of the order against Texaco, the setting aside of which by the Court of Appeals the Government does not contest.

*Reversed and remanded.*

Mr. Justice Harlan, concurring.

I join the Court's opinion, with the following statement. To the extent that my action in joining today's opinion is inconsistent with my action in joining my Brother Stewart's dissent in *Atlantic Refining Co.* v. *FTC,* 381 U. S. 357, 377 (1965), candor compels me to say that further reflection has convinced me that the portions of the Commission's order which the Court today sustains were within the authority granted to the Commission under § 5 of the Federal Trade Commission Act.

Mr. Justice Stewart, dissenting.

We are told today that "[t]he sales-commission system for marketing TBA is inherently coercive." If that is so, then the Court went to a good deal of unnecessary trouble in *Atlantic Refining Co.* v. *FTC,* 381 U. S. 357, 368, to establish that Atlantic "not only exerted the persuasion that is a natural incident of its economic power, but coupled with it direct and overt threats of reprisal . . . ."

The Court acknowledges that "the evidence in this case regarding coercive practices is considerably less substantial than the evidence presented in *Atlantic.*" But that is an understatement. For the fact is that in this case the Court of Appeals was totally unable to "find that Texaco used its controlling economic power to compel its dealers to purchase sponsored TBA." 127 U. S. App. D. C. 349, 356, 383 F. 2d 942, 949. That is why this Court must perforce create today's *per se* rule of "inherent" coercion.

For the reasons set out at some length in my separate opinion in *Atlantic, supra,* at 377, I cannot agree to any such *per se* rule. Accordingly, I would affirm the judgment of the Court of Appeals.