**FEDERAL TRADE COMMISSION,**
Petitioner,

v.

**David R. MARKIN, President and Check-er Motors Corporation, Respondents.**

**No. K 74-268 CA.**

United States District Court,
W. D. Michigan.

Dec. 10, 1974.

Robert Greene, Asst. U. S. Atty., Grand Rapids, Mich., Robert E. Duncan, Federal Trade Commission, Washington, D. C., for petitioner.

Lee A. Freeman, Jr., Chicago, Ill., Alfred J. Gemrich, Kalamazoo, Mich., for respondents.

## OPINION ON PETITION FOR ENFORCEMENT OF SUBPOENA DUCES TECUM

MILES, District Judge.

This is a proceeding initiated by the Federal Trade Commission pursuant to Section 9 of the Federal Trade Commission Act 15 U.S.C. § 49 [1] to enforce an administrative subpoena duces tecum which was issued on March 19, 1973 in furtherance of an investigatory resolution dated January 3, 1973. The resolution, the full text of which is set forth in the margin,[2] seeks:

"To determine whether or not the activities and practices by Checker Motors Corporation, Checker Taxi Cab Company, Inc., Yellow Cab Company, Inc. (Chicago), or others in connection with the regulation, ownership, and operation of taxi services, in commerce, are conducted in an unfair manner for the purpose or with the effect of restraining or foreclosing competition, in violation of Section 5 of the Federal Trade Commission Act (15 U.S.C. 45)."

■ The subpoena at issue, containing 29 specifications, requests the originals or verified copies of numerous types of corporate documentation which purportedly relate to the operation and policies of respondent corporation and its subsidiaries and affiliates in the Chicago area. Respondents have consistently asserted their right to contest this subpoena, both before the Commission and this Court, and at oral argument on this matter, and contend that we are precluded from enforcing the subpoena, or in the alternative, that even if we are not so precluded, the specifications of this subpoena are such that this Court cannot properly enforce them. Citing United States v Yellow Cab, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947) and United States v. Yellow Cab, 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949) as being res judicata here, respondents strenuously argue that we are prohibited from enforcing this subpoena. The two

1. For the purposes of sections 41 to 46 and 47 to 58 of this title the Commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any corporation being investigated or proceeded against; and the Commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation. Any member of the Commission may sign subpoenas, and members and examiners of the Commission may administer oaths and affirmations, examine witnesses, and receive evidence.

Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpoena the Commission may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.

Any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any corporation or other person to appear before the Commission, or to produce documentary evidence if so ordered, or to give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

2. RESOLUTION DIRECTING USE OF COMPULSORY PROCESS IN NONPUBLIC INVESTIGATION. File 721 0091
Nature and Scope of Investigation:
To determine whether or not the activities and practices by Checker Motors Corporation, Checker Taxi Cab Company, Inc., Yellow Cab Company, Inc. (Chicago), or others in connection with the regulation, ownership, and operation of taxi services, in commerce, are conducted in an unfair manner for the purpose or with the effect of restraining or foreclosing competition, in violation of Section 5 of the Federal Trade Commission Act (15 U.S.C. 45).
The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.
Authority to Conduct Investigation:
Sections 6, 9 and 10 of the Federal Trade Commission Act, 15 U.S.C. 46, 49, 50; FTC Procedures and Rules of Practice 16 C.F.R. 1.1, et seq. and supplements thereto.

cases referred to above involved allegations that the respondents herein, along with a number of others, conspired to restrain trade in violation of Sections 1 and 2 of the Sherman Anti-Trust Act in the purchase and use of taxicabs in Chicago, Pittsburgh, New York City and Minneapolis. The cases involved suits by the United States alleging that the respondents herein, along with a number of other companies, conspired to restrain and monopolize interstate trade in violation of § 1 and § 2 of the Sherman Anti-Trust Act through their methods of selling taxicabs in Chicago, New York, Minneapolis and New York City, and in their operation of taxicab companies in those same cities. In the first case, the Supreme Court reversed and remanded the District Court's finding that the complaint failed to state a claim upon which relief could be granted. The second case upheld the District Court's holding after a trial on remand that the United States had failed to sustain its burden of proof with respect to the alleged anti-trust violations.

More specifically, in the first Yellow Cab case, the court held that although the government's allegations with respect to the purchase of taxicabs and the transportation of interstate passengers between railroad stations in Chicago did state a claim under the Sherman Act, the government's allegations with respect to the transportation of interstate passengers to and from stations did not, concluding that:

> " . . . such transportation is too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act. These taxicabs, in transporting passengers and their luggage to and from Chicago railroad stations, admittedly cross no state lines; by ordinance, their service is confined to transportation 'between any two points within the corporate limits of the city.' . . . In short, their relationship to interstate transit is only casual and incidental." 332 U.S. 230, 231, 67 S.Ct. 1566.

It is this holding that respondents would have us apply here with the result the current line of investigation by the FTC is barred as having been authoritatively handled in a prior litigation.

While it is true that both the United States and all the respondents herein were also parties to the *Yellow Cab* cases and that the issues both there and here bear some relationship, it must be emphasized that the *Yellow Cab* decisions arose under a different statute than that guiding us here. More importantly, however, the Court in the first *Yellow Cab* decision specifically limited its decision therein in a way directly in point to the situation now facing this Court:

> "We do not mean to establish any absolute rule that local taxicab service to and from railroad stations is completely beyond the reach of federal power or even beyond the scope of the Sherman Act . . .
>
> Likewise, we are not to be understood in this case as deciding that all conspiracies among local cab drivers are so unrelated to interstate commerce as to fall outside the federal ken. A conspiracy to burden or eliminate transportation of passengers to and from a railroad station where interstate journeys begin and end might have sufficient effect upon interstate commerce to justify the imposition of the Sherman Act or other federal laws resting on the commerce power of Congress." 332 U.S. 232, 233, 67 S.Ct. 1568.

We have in this case, coming almost 30 years after the *Yellow Cab* decisions, precisely the potential for change which the Supreme Court contemplated therein. In addition, in analyzing a similar *res judicata* argument, the Second Circuit has stated:

> "In any event, new violations will support new proceedings dealing with different periods of time, as least where there is no indication of harassment by the Commission. See F.T.C. v. Raladam Co., 1942, 316 U.S. 149, 62 S.Ct. 966, 86 L.Ed. 1336; 2 Davis Adminis-

trative Law Treatise 570–71 (1958); cf. Grandview Dairy, Inc. v Jones, 2 Cir., 157 F.2d 5, certiorari denied, 1946, 329 U.S. 787, 67 S.Ct. 355, 91 L.Ed. 675." Exposition Press v. F.T. C., 295 F.2d 869, 872 (2 Cir. 1961).

Nor do any of the respondents contest the Commission's broad power to conduct investigations. (See 15 U.S.C. § 45 and Memorandum in Opposition, p. 10).

For these reasons, we conclude that the *Yellow Cab* cases are not jurisdictionally dispositive of the present litigation and that we are therefore required to proceed to a direct consideration of the issues raised by the government's petition for enforcement of its subpoena.

Respondents also argue that we should confront the jurisdictional issues here through a consideration of whether the subject matter of this investigation is sufficiently "in commerce" under § 5 of the Act to justify this investigation. A careful study of the cases, however, would seem to lead the Court to a different procedure. In Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1945), the Supreme Court considered the propriety of a subpoena issued by the Department of Labor under § 9 and § 11(a) of the Fair Labor Standards Act (which incorporates § 9 of the Federal Trade Commission Act). After a survey of the cases up to that time, the Court stated:

"Without attempt to summarize or accurately distinguish all of the cases, the fair distillation, in so far as they apply merely to the production of corporate records and papers in response to a subpoena or order authorized by law and safeguarded by judicial sanction, seems to be that the Fifth Amendment affords no protection by virtue of the self-incrimination provision, whether for the corporation or for its officers; and the Fourth, if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable. As this has taken form in the decisions, the following specific results have been worked out. It is not necessary, as in the case of a warrant, that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one. It is enough that the investigation be for a lawfully authorized purpose, within the power of Congress to command. This has been ruled most often perhaps in relation to grand jury investigations, but also frequently in respect to general or statistical investigations authorized by Congress." 327 U.S. 208, 209, 66 S.Ct. 505.

The Court then applied these principles to the subpoena, and concluded at p. 213–214, 66 S.Ct. at p. 508:

"On the other hand, petitioners' view, if accepted, would stop much if not all of investigation in the public interest at the threshold of inquiry and, in the case of the Administrator, is designed avowedly to do so. This would render substantially impossible his effective discharge of the duties of investigation and enforcement which Congress has placed upon him. And if his functions could be thus blocked, so might others of equal importance.

We think, therefore, that the courts of appeals were correct in the view that Congress has authorized the Administrator, rather than the District Courts in the first instance to determine the question of coverage in the preliminary investigation of possibly existing violations; in doing so to exercise his subpoena power for securing evidence upon that question, by seeking the production of petitioners relevant books, records and papers; and, in case of refusal to obey his subpoena, issued according to the statute's authorization, to have the aid of the district court in enforcing it. No constitutional provision forbids Congress to

do this. On the contrary, its authority would seem clearly to be comprehended in the 'necessary and proper' clause, as incidental to both its general legislative and its investigative powers."

This holding was clarified in U. S. v. Morton Salt, 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950) as follows:

"While they may and should have protection from unlawful demands made in the name of public investigation, cf. Federal Trade Comm'n v. American Tobacco Co., 264 U.S. 298, 44 S. Ct. 336, 68 L.Ed. 696, corporations can claim no equality with individuals in the enjoyment of a right to privacy. Cf. United States v. White, supra. They are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege of acting as artificial entities. The Federal Government allows them the privilege of engaging in interstate commerce. Favors from government often carry with them an enhanced measure of regulation. Cf. Graham v. Brotherhood of Locomotive Firemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22; Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Wickard v. Filburn, 317 U.S. 111, at 129, 63 S.Ct. 82, 87 L.Ed 122. Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.

Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. Federal Trade Comm'n v. American Tobacco Co., supra. But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant."

Although research does not indicate a Sixth Circuit ruling in this particular area, other Federal courts have had occasion to construe these principles. Citing this line of cases, the Second Circuit in F.T.C. v. Standard American, Inc., 306 F.2d 231 (2 Cir. 1962) stated at 234:

"The Courts have time and again held that the Commission may exercise its 'broad power of investigation and subpoena, prior to the filing of a complaint'; the Commission, as an administrative agency of the United States 'charged with seeing' that the Act is enforced, 'has a power of inquisition'; it is 'more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not'; it is sufficient if the investigation is within the Commission's authority and unless the evidence sought by the subpoenas is clearly irrelevant and immaterial it is the duty of the district court to order compliance; and subpoenaed documents may be retained by the Commission for a reasonable length of time." [Footnotes omitted]

The Eighth Circuit has formulated the requisites of a successful administrative investigatory subpoena *duces tecum* in this way:

"The investigatory authority of an administrative agency is not without limitations. There is general unanimity among the courts that a subpoena meets the requirements for enforcement if the inquiry is (1) within the authority of the agency; (2) the demand is not too indefinite and (3) the information sought is reasonably relevant. United States v. Morton Salt Co., 338 U.S. 632, 652, 653, 70 S.Ct. 357, 94 L.Ed. 401; Oklahoma Press Publishing Co. v. Walling, supra, 327

U.S. 186, 208, 66 S.Ct. 494, 90 L.Ed. 614; Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 509, 63 S.Ct. 339, 87 L.Ed. 492; Civil Aeronautics Board v. Hermann, 353 U.S. 322, 77 S.Ct. 804, 1 L.Ed.2d 852." Adams v. F.T.C. 296 F.2d 861, 867 (8 Cir. 1961).

Specifically in point with regard to respondent's arguments on jurisdiction is F.T.C. v. Gibson, 460 F.2d 605 (5 Cir. 1972), wherein the Court at p. 608 held that:

> "The rationale of the Oklahoma Press rule is that it allows enforcement of subpoenas where the evidence necessary to establish the interstate nature of the commerce involved is in the possession of the suspected violator and can be secured only by such a subpoena. Under this rule appellants may not litigate the jurisdictional issue as a defense in a subpoena enforcement proceeding."

Beyond these general guidelines, the courts have also evolved more concrete types of methodology with which to measure the adequacy of administrative subpoenas. At least one court has utilized a comparison of the specifications in the subpoena with the investigative resolution. See Moore Business Forms v. F.T.C., 113 U.S.App.D.C. 231, 307 F.2d 188 (D.C. Cir. 1962). This same case shows that a guide to the relevancy of the subpoena can be found in the elements of the offenses that have been alleged by the Commission. Id.

■■ What all this would appear to mean in terms of relevancy is that the specifications of the subpoena should bear a reasonable relationship to the kinds of information which are required in order to ascertain where respondents stand with respect to the allegations raised by the Commission. As mentioned, what the Commission has done here is to raise the possibility that respondents have violated 15 U.S.C. § 45 through activities which might be "unfair" and have the effect of "restraining or foreclosing competition." Broadly speaking, in order to substantiate such

charges, it must be shown that under the circumstances of the case, concerted action in commerce has been taken, which either adversely affects free competition or is an incipient menace to it. See F.T.C. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), F.T.C. v. Texaco, 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968), LaPeyre v. F.T.C., 366 F.2d 117 (5 Cir. 1966).

■ Before we arrive at a final disposition of this subpoena, the wide sweep of its specifications requires that we take note of some additional factors with respect to their potential burdensomeness. The first is the nature of respondents' arguments on this issue. We have reviewed carefully the oral argument and the memoranda that have been filed here and we find that beyond citing to us the specifications which respondents consider especially onerous, they do very little to inform the Court as to the exact nature and extent of the hardship which they would impose. We are thus left with a situation very similar to that which confronted the Second Circuit in S.E.C. v. Brigadoon Scotch Distributing Co., 480 F.2d 1047 (2 Cir. 1973), where the Court found at p. 1056 that "appellants have been unable to show specifically how production of this information will result in harm to their business," and where the Court concluded that:

> "Thus the mere suggestion by appellants of possible damage to their business activities is not sufficient to block an authorized inquiry into relevant matters." See Newmark & Co. v. Wirtz, 330 F.2d 576, 578 (2d Cir. 1964).

Similarly, in F.T.C. v. Standard American, Inc., supra, the Third Circuit found that:

> "It is settled that if appellants wanted the District Court to make 'appropriate provisions for assuring the minimum interference with the conduct of [their] business,'[11] they should have met their burden of showing the unreasonableness of the Commission's demand[12] and should have 'made a

record that would convince [the District Court] of the measure of their grievance rather than ask [it] to assume it.' "[13]

11. Civil Aeronautics Board v. Hermann, supra note 9, 353 U.S. at page 323, 77 S.Ct. at page 805.

12. Oklahoma Press Publishing Co. v. Walling, supra, note 7, 323 U.S. at pages 217–218, 66 S.Ct. at pages 509–510.

13. United States v. Morton Sale Co., supra, note 8, 338 U.S. at page 654, 70 S.Ct. at page 369."

Respondents should produce all information demanded with the exception of those matters conceded by petitioner. Attachment "A" of "Attachments to Memorandum in Opposition to Enforcement of Subpoena Duces Tecum" (pages 2–8). In short, respondents are to be assured of confidentiality, reasonableness in acceptance of copies of documents or summaries, shortened time periods (viz. such as using 1970 in place of 1968 in Specification No. 1) and the elimination of No. 10.

In sum, on this record, we simply cannot at this time be convinced that the production of the subpoenaed information will do serious harm to respondents' business.

This is especially so in light of the forthright offers by the Commission to adapt the subpoena's specifications to the record keeping format of respondents. This intent is conveyed both by the final specification of the subpoena,[3] and by the clear expressions of the Commission's counsel at oral argument.[4] We face circumstances similar to that confronted by the District Court in the Standard American case, supra. There, as here, the investigated party was unable to show that compliance would seriously harm his operations and the Commission showed a willingness to compromise on the mechanics of compliance.[5] In this situation, the District Court concluded at 195 F.Supp. 801, 803 and was affirmed by the Third Circuit in F.T.C. v. Standard American, supra that:

"We will accordingly enter an Order, but point out that if it is brought to the attention of the Court that any serious hindrance to respondents' business will be caused by adherence to the provisions of the Order, we will reconsider it as to those specific instances."

We feel it is incumbent that we here do likewise. Accordingly, based on respondents' inability to substantiate their claims of burdensomeness, the Commission's willingness to tailor the specifica-

3. A verified statement as will show: (a) the method used for retrieval of information from books, records and other documents including, but not limited to the following areas: (1) taxicab operations, (2) taxicab maintenance, (3) taxicab fares and destinations, salaries, and all other phases of YCC's business.

4. At the conclusion of the Commission's argument, counsel made the following statement: Finally, on the question of burdensomeness and over-broadness of the subpoena, the Commission again does not know what the respondent's records consist of. We don't know how—exactly how they are kept, how they are preserved, whether they are on automated computer tapes, whether they can be promptly reproduced, or what sort of problems are encountered in that preservation of their records. We have offered to meet with them, and in the letter in the record, as an attachment to the respondent's memorandum in opposition, Attachment A, the concluding paragraph is an offer to meet with the respondents

and their attorneys, their accountants, and to examine the actual method in which they keep documents, with the hope toward narrowing the request. This offer was not accepted, and the Commission is willing to meet with respondents and to, in the course of the investigation, to narrow the documents, but the Commission cannot narrow them in advance. They cannot give up the—its responsibilities to enforce the Act before it knows what it's doing before it's had access to the documents and can consider them and weigh them in the terms of its own responsibility.

5. In the Standard American case, the Commission was willing to accept copies of the subpoenaed records so that the originals would not have to be sent to Washington. Here the Commission has shown considerably more flexibility. They not only will accept copies of the requested evidence, but their offer also raises the real possibility that the subpoena's scope can be modified and possibly narrowed by agreement of the parties themselves.

872

tions of the subpoena to respondents' particular situation, and our earlier findings with regard to relevancy,

It is ordered:

That respondents David R. Markin and Checker Motors Corporation produce the evidence requested in the Federal Trade Commission subpoena *duces tecum* issued March 19, 1973 [with the exception of information requested in specification 10 and other modications set forth which the Court finds not to be relevant.]

The parties will, prior to the production of evidence, pursuant to the Federal Trade Commission's offer, meet in a diligent and good faith effort to modify the subpoena's terms so as to make compliance with its specifications not unduly burdensome on respondents.

In the event that compliance with the subpoena's terms becomes patently vexatious and a serious hindrance to the pursuit of respondents' business, the parties may file the appropriate motions, fully supported by briefs, and the Court will reconsider those specifications thus put in issue.

It is so ordered.