**LEE NATIONAL CORPORATION**

v.

**ATLANTIC RICHFIELD COMPANY, the Goodyear Tire & Rubber Company and the Goodyear Tire & Rubber Company, Inc., and the Firestone Tire & Rubber Company.**

**Civ. A. No. 40391.**

United States District Court,
E. D. Pennsylvania.

Feb. 4, 1970.

Edwin P. Rome, Philadelphia, Pa., for plaintiff.

F. L. Ballard, Jr., Henry T. Reath, H. Francis DeLone, Esq., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

TROUTMAN, District Judge.

### Nature of Action

This action is a suit for treble damages brought under Section 4 of the Clayton Act (15 U.S.C. § 15) by the plaintiff, Lee National Corporation, formerly a manufacturer of automobile tires and related products, against Atlantic Richfield Company (Atlantic), a distributor of petroleum and related products, The Goodyear Tire & Rubber Company and The Goodyear Tire & Rubber Company, Inc., (Goodyear) and The Firestone Tire & Rubber Company (Firestone), manufacturers of automobile tires and related products. Violations of Sections 1 and 2 of the Sherman Act are alleged.

Plaintiff has filed a motion for partial summary judgment on the issue of liability pursuant to F.R.Civ.P. 56 contending that certain so-called sales commission agreements existing between Atlantic and Goodyear and between Atlantic and Firestone, from 1950 to 1966 and pertaining to the purchase and sale of tires, batteries and accessories (TBA) were illegal *per se*. In the motion filed plaintiff alleges and contends that *these* very sales commission *agreements* were

challenged and their illegality *per se* determined in three prior related proceedings originating before the Federal Trade Commission (FTC), namely, Atlantic Refining Company v. F. T. C., 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965) (Atlantic), Shell Oil Company v. F. T. C., 360 F.2d 470 (5th Cir.) cert. denied 385 U.S. 1002, 87 S.Ct. 703, 17 L.Ed.2d 541 (1966) (Shell) and F. T. C. v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968) (Texaco). Additionally, plaintiff relies upon International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), United States v. Loews, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), and Fortner Enterprises, Inc. v. United States, 394 U.S. 495 (1969) and the dissenting opinion in United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1968).

### History of Prior FTC Proceedings

Prior to February, 1964 Lee National was known as Lee Rubber & Tire Corporation (Lee), a manufacturer of automobile tires and other related rubber products with its principal office in Conshohocken, Pennsylvania. Lee National sold its tire plant and other operating assets to Goodyear pursuant to an Option Agreement dated March 1, 1965, and thereafter Lee National went out of the tire business. This action was commenced on May 31, 1966, following the transfer of Lee's plant to Goodyear on January 17, 1966.

During the period from 1934 to 1951, Atlantic had purchased substantial quantities of Lee tires from Lee for resale by Atlantic to Atlantic gasoline service stations under a marketing plan known as a "Purchase-Resale Plan".[1] In 1951, the "Purchase-Resale Plan" was discontinued in favor of a "Sales Commission Plan".[2]

Under the sales commission plan the oil company did not buy TBA products

---

1. See affidavit of Frederic Ballard, p. 2.

2. See affidavit of Dwight Colley, p. 1.

for resale to its service stations, but it did offer its stations a TBA program built around a line of products which it recommended and promoted. Under this method of distribution, the tires, batteries and accessories were sold to the service stations through local tire company wholesalers. The oil company, however, while relieved of the responsibility for warehousing and distribution, did render sales assistance and other promotional services for which the tire company paid it a sales commission.[3]

In 1951 Atlantic offered Lee, Goodyear and Firestone each a portion of its business under a sales commission plan. Goodyear and Firestone accepted Atlantic's proposal, but Lee declined.[4] Lee concluded that its refusal of Atlantic's offer would free Lee's organization to solicit not only Atlantic's dealers and jobbers, but also other oil companies, dealers and jobbers in Atlantic's marketing area.[5]

In 1956, the Federal Trade Commission brought three separate administrative proceedings under the Federal Trade Commission Act (TBA proceedings) challenging the industry's use of the sales commission plan as an unfair method of competition under Section 5 of that Act. Each proceeding included as respondents a tire company and an oil company, attacking their sales commission arrangements so that the proceedings were, in practical effect, industry-wide.[6]

On March 9, 1961, the Commission's final order was entered, holding that the Atlantic-Goodyear sales commission contract constituted an unfair method of competition under Section 5 of the Federal Trade Commission Act. Orders were entered by the Commission enjoining future use of the sales commission plan.[7]

These orders were then appealed, first to the Court of Appeals for the Seventh Circuit, Goodyear Tire & Rubber Company v. F. T. C., 331 F.2d 394 (7th Cir. 1964), and then to the Supreme Court of the United States, Atlantic Refining Company v. F. T. C., 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965).

## Discussion

A fair consideration of plaintiff's motion and its reliance upon specific precedents compels a careful review of the several cases in question and the *per se* principle there discussed.

In International Salt Co., Inc. v. United States, 332 U.S. 392, 68 S.Ct. 12 (1947), the Government brought a civil action to enjoin the Salt Company from carrying out the provisions of its leases of patented machines requiring that the lessees use therein only International Salt products. The restriction was alleged to violate the Sherman Act. Summary judgment under F.R.Civ.P. 56 was held to have been properly entered against International. In so holding, the Court said "not only is price-fixing unreasonable, *per se*, (citing cases) but also it is unreasonable, *per se*, to foreclose competitors from any substantial market. (Citing cases) The volume of business affected by these contracts cannot be said to be insignificant or insubstantial and the tendency of the arrangement to accomplishment of monopoly seems obvious. Under the law, agreements are forbidden which 'tend to create a monopoly' * * * ". 332 U.S. at 396, 68 S.Ct. at 15.

However, monopolistic power in the tying product appears to be no longer

---

3. See affidavit of Frederic Ballard, p. 3.

4. See affidavit of Anson Segur, p. 3.

5. See affidavit of Anson Segur, pp. 2, 3.

6. Atlantic and Goodyear were respondents in one (Docket No. 6486); Shell and Firestone in another (Docket No. 6487); and Texaco and Goodrich in the third (Docket No. 6485).

7. Similar injunctive orders were ultimately entered against Shell-Firestone, Shell Oil Co. v. F. T. C., 360 F.2d 470 (5th Cir. 1966), cert. den., 385 U.S. 1002, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967) and Texaco-Goodrich, Texaco, Inc. v. F. T. C., 127 U.S.App.D.C. 349, 383 F.2d 942, (1967) rev'd, 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968).

necessary.[8] In Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1950) the Government filed suit seeking a declaration that certain "preferential routing" agreements, inserted by the Railway Company in leases and deeds, were unlawful as violative of Section 1 of the Sherman Act. The District Court granted the Government's motion and the Supreme Court, in affirming, specifically defined a "tying arrangement" and elaborated as follows:

> For our purposes a tying arrangement may be *defined* as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed "tying agreements serve hardly any purpose beyond the suppression of competition". Standard Oil Co. of California v. United States, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons "tying agreements fare harshly under the laws forbidding restraints of trade". Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 606, 73 S.Ct. 872, 879, 97 L.Ed. 1277. They are unreasonable in and of themselves whenever a party has *sufficient economic power* with respect to the tying product to appreciably restrain free competition in the market for the tied product and a *"not insubstantial"*

amount of interstate commerce is affected*. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20. Cf. United States v. Paramount Pictures, 334 U.S. 131, 156–159, 68 S.Ct. 915, 928–929, 92 L.Ed. 1260; United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236. * * (356 U.S. at 5–6, 78 S.Ct. at 518–519)

\* \* \* \* \* \*

> In short, we are convinced that the essential prerequisites for treating the defendant's tying arrangements as unreasonable "per se" were conclusively established below and that the defendant has offered to prove nothing there or here which would alter this conclusion. (Emphasis added) (356 U.S. at 8, 78 S.Ct. at 520)

While *Northern Pacific* may have left some question as to what constitutes "sufficient economic power" the more recent case of United States v. Loews, Inc., 371 U.S. 38, 83 S.Ct. 97 (1962) likewise relied upon by the plaintiff, clearly stated that "even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes". (371 U.S. at 45, 83 S.Ct. at 102) Thus, a tying arrangement violates the Sherman Act when the tying product, by virtue of either uniqueness or consumer appeal, gives the defendant sufficient economic power in the tying product to accomplish the tie-in and a not insubstantial amount of commerce in the tied product is affected.[9]

Fortner Enterprises, Inc. v. United States, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) broadened the application of the rule in applying it to a situation involving not one but two sellers, i. e., "credit" was provided by one corporation on condition that a product

---

8. See Supplement to Report of the Attorney General's National Committee to study the Antitrust Laws 1955–1968, Chapter IV, B, at page 106.

9. Antitrust Developments, 1955–1968, Supplement to Report of the Attorney General's National Committee to Study the Antitrust Laws, page 107.

be purchased from a separate corporation.[10]

Thus, tying agreements "fare harshly" under the law and there are those who suggest that *all* such agreements are illegal *per se.* However, the courts have recognized that, under certain circumstances, tie-ins are permitted. Thus, in United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.) aff'd per curiam 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1960), a tie-in was held to be justified during the development period of a new industry. In Dehydrating Process Co. v. A. O. Smith Corp., 292 F. 2d 653 (1st Cir.) cert. denied 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961) a tie-in of patented products was approved where separate sales had led to widespread dissatisfaction. Similarly, to assure product quality control in the protection of a trademark a tie-in is permitted. Susser v. Carvel Corp., 332 F.2d 505 (2nd Cir.), petition for cert. dismissed 381 U.S. 125, 85 S.Ct. 1364, 14 L. Ed.2d 284 (1964).[11]

■ Therefore, given the requisite economic power and effect upon commerce, tying agreements are illegal except where special circumstances and conditions justify such tie-in. However, before the question of economic power, effect on commerce and special circumstances becomes pertinent it must be determined whether a tying agreement is involved. In this case we are not left without guidance in that the very agreement, plan, or scheme under attack has been the subject of proceedings before the Federal Trade Commission and subsequent appeals to the Supreme Court.

■ That the sales commission plan here involved was found to be an unfair method of competition in violation of Section 5 of the Federal Trade Commis-

sion Act (15 U.S.C. § 45) does not, as plaintiff suggests, directly lead to the conclusion that the contract and plan are illegal *per se* under the Sherman Act. No case has so held. To so conclude requires that all the necessary requisites be found, namely, *a tying agreement,* sufficient economic power and a not insubstantial effect on commerce. Thus, we must first inquire whether a tying agreement or scheme or plan is involved.

In Atlantic Refining Company v. F. T. C., 381 U.S. 357, 85 S.Ct. 1498, 14 L. Ed.2d 443 (1965) the Court was concerned with findings of the Federal Trade Commission that the plan here involved an unfair method of competition in violation of Section 5 of the Federal Trade Commission Act.[12] In affirming the Commission's order the Court of Appeals appraised " * * * the broader aspects of the system as a *tying arrangement"*. 381 U.S. at 363, 85 S.Ct. at 1503. (Emphasis added) Thus, when the case came before the Supreme Court there was before that Court the statement of the Court of Appeals that the broader aspects of the system suggested a *tying arrangement.* Were it, in the judgment and opinion of the Supreme Court, a tying arrangement the Court could have affirmed without more. It did not. At the expense of considerable effort and language it took great pains to point out that a "tying arrangement" was *not* involved. At 381 U.S. at page 369, 85 S.Ct. at page 1506, the Court stated:

At the outset we must stress what we do *not find* present here. We recognize that the Goodyear-Atlantic contract is *not a tying arrangement * * *. [N]either do we understand that either the Commission or the Court of Appeals held that the sales commission arrangement was a tying scheme.* What they did find was that

---

10. It should be noted that they were related corporations.

11. For general discussion of subject see supplement to report of the Attorney General's National Committee to Study the Antitrust Laws, 1955–1968, Chapter IV, B (at 108).

12. Section 5 of the Act provides in pertinent part:
    "(a) (1) Unfair methods of competition in commerce, and unfair * * * acts or practices in commerce, are declared unlawful."

the central competitive characteristic was the same in b.oth cases \* \* \* [I]ts (the Commission's) use as a *guideline* of recognized violations of the antitrust laws was, we believe, entirely appropriate. *It has long been recognized that there are many unfair methods of competition that do not assume the proportions of antitrust violations.* (Emphasis added)

Continuing with its discussion, the Court stated at pages 370 and 371, 85 S.Ct. at page 1506:

Although the Commission relied on such cases here, it *expressly rejected a mechanical application of the law of tying arrangements.* Rather it looked to the entire record. \* \* \*

\* \* \* \* \* \*

Thus, the Commission was warranted in finding that the *effect* of the plan was *as though* Atlantic had agreed with Goodyear to require its dealers to buy Goodyear products and had done so.

\* \* \* \* \* \*

But just as the *effect* of this plan is *similar* to that of a tie-in, so it is unnecessary to embark upon a full scale economic analysis of competitive effect (to determine whether an unfair method of competition was involved in violation of § 5 of the Federal Trade Commission Act). (Parentheses ours)

All that the Court did was to suggest that the plan here involved is sufficiently similar to a tie-in to eliminate the need for "extensive economic analysis of market percentages or business justifications (by the Commission) in determining whether this was a method of competition which Congress has declared unfair and therefore unlawful". 381 U. S. at 371, 85 S.Ct. at 1507. In so carefully pointing out that the present plan is *not a tie-in* the Court in its wisdom may well have foreseen the future use or mis-

use of a *per se* rule under the facts here involved. In any event, we cannot overlook the obvious care exercised by the Court in making certain that its decision would not, in the future, be construed as a finding that the plan in question is illegal *per se.*[13]

In Shell Oil Company v. F. T. C., 360 F.2d 470 (5th Cir. 1966), Judge Wisdom analyzed the *Atlantic* case as follows at page 474:

As we read Atlantic, the Supreme Court approached only to the brink of holding TBA sales commission contracts per se unlawful. True enough, on the record before it, the Court might have held that the Atlantic-Goodyear distribution system, as distinguished from the bare contract, was a tacit but true arrangement. But the Court, like the Commission in its 1961 decision, declined to classify the sales commission 'arrangement' as a 'tying' scheme. And nowhere in the opinion can be found the words 'per se'. This could hardly have been an accident.[14]

We do not disagree with Judge Wisdom's observations. However, we do not necessarily agree that the Court engaged in brinkmanship. Rather, it found sufficient to justify the Commission's finding, without further investigation of market conditions, etc., that there was a violation of Section 5 of the Federal Trade Commission Act. And, in so doing, it desired to make crystal-clear that it was *not* finding the plan illegal *per se* for .other purposes. Who can say that the Court did not perhaps contemplate precisely the question we face today?

In Texaco, Inc. v. F. T. C., 127 U.S. App.D.C. 349, 383 F.2d 942 at page 947 (1967), Judge Burger (now Chief Justice Burger) stated:

[W]e do not read *Atlantic* to conclude that the Court was condemning these practices as *per se* illegal." (Emphasis added)

---

13. A shallow analysis of the Court's opinion and language may well overlook this observation.

14. Cert. denied 385 U.S. 1002, 87 S.Ct. 703, 17 L.Ed.2d 541.

When *Texaco* reached the Supreme Court,[15] the principal question involved was whether the Texaco Company held sufficient economic power over its dealers absent certain coercive conduct which was present in *Atlantic*. For the purpose of holding that the Commission was warranted in its findings and only for that purpose, the Court found "[t]hat Texaco holds dominant economic power over its dealers * * * ". 393 U.S. at 226, 89 S.Ct. at 431. In concurring Mr. Justice Harlan clearly suggested that the Court was doing nothing more than holding that " * * * the portions of the Commission's order which the Court today sustains were *within the authority granted to the Commission under § 5 of the Federal Trade Commission Act.*" (Id. at 231, 89 S.Ct. at 434) (Emphasis added)

■ Mr. Justice Stewart, dissenting, did no more than suggest that the majority was creating a "per se rule of 'inherent' coercion" (Id. at 232, 89 S.Ct. at 434) against the background of the limited legal question before the Court, i. e., whether the Commission was justified in entering its order pursuant to § 5 of the Federal Trade Commission Act. Neither the reasoning of the Court nor the language used (including the dissent) suggests a persuasive basis for plaintiff's contention here advanced. Certainly, in any event, there is insufficient basis for the entry of summary judgment.[16]

A fair approach to the issue indicates that we cannot, as plaintiff would have us do, take certain limited language out of context and, upon it, enter partial summary judgment against the defendants. In considering *International Salt, Northern Pacific, Loews, Fortner* and like cases it must be remembered that they did not involve, as here, Federal Trade Commission proceedings under Section 5 of the Federal Trade Commission Act. In such Federal Trade Commission proceedings the function of the Court is somewhat limited in its review of administrative proceedings. Moreover, such proceedings contemplate, not an antitrust action or a treble-damage action, as here, but rather the discovery of "unfair methods of competition", by "an administrative body of practical men" for the purpose of eradicating business "evils" in an early or incipient stage.[17] The Court's inquiry is concerned with the order of the Commission; whether it acted within the scope of the authority vested in it; whether there was "warrant in the record" for its findings and conclusions; whether there is a "reasonable basis in law" for its order with particular reference, in some instances, to the reasonableness of the remedy reflected in the order.[18] Language used by the Court in thus reviewing a Commission's order may not be taken out of context and used as the basis for a summary judgment in proceedings of a different nature such as a private treble damage action.

There is even greater reason why the language used by Mr. Justice Marshall in the dissenting opinion in the case of United States v. Container Corporation of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) is not here controlling.[19] Justice Marshall's language was

---

15. F. T. C. v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968).

16. Summary judgment, if otherwise justified, is not improper in antitrust cases, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545, but is "disfavored", Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 505, 89 S.Ct. 1252, 22 L.Ed.2d 495.

17. F. T. C. v. Texaco, 393 U.S. 223, 89 S. Ct. 429, 21 L.Ed.2d 394 (1968).

18. Atlantic Refining Company v. F. T. C., 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965).

19. That language was:
"We have recently added to this list (the practices listed in *International Salt* as illegal *per se*) certain sales-commission systems for the marketing of tires, batteries, and accessories by service stations affiliated with major

pure dictum as regards the application of *International Salt* to TBA and the sales commission plan or system here in question. And, the statement was made without reference to the context in which *Texaco* was decided and the issues there before the Court. It is not validly supportive of the plaintiff's motion. The sense of the language that follows in the succeeding paragraph of said dissent is significant. Mr. Justice Marshall states:

> *Per se* rules always contain a degree of *arbitrariness.* They are justified on the assumption that the gains from imposition of the rule will far outweigh the losses and that *significant administrative advantages will result.* 393 U.S. at 341, 89 S.Ct. at 514 (Emphasis added)

He then concluded that the agreement in *Container* should not be condemned *per se* "without proof". The dissent as a whole does not support the plaintiff's motion.

In summary, we have found no cases and the plaintiff has cited none in which the courts have held that Commission findings under Section 5 of the Federal Trade Commission Act are *per se* determinative of the issues raised in a subsequent treble damage action brought under Section 4 of the Clayton Act alleging violations of Sections 1 and 2 of the Sherman Act. The lack of such direct precedent supportive of plaintiff's contentions is understandable. Moreover, plaintiff's contentions are not supported by the several cases upon which it principally relies, including *International Salt, Northern Pacific, Loews, Fortner, Container, Atlantic, Shell,* and *Texaco, supra.*

Therefore, we will deny plaintiff's motion for partial summary judgment. Before reaching that point we are confronted with defendants' motion for deferral of plaintiff's motion for summary judgment.[20] Said motion was substantially

withdrawn at time of oral argument. In any event we would vacate our order of March 28, 1969, and deny defendants' motion for deferral.

Our disposition of plaintiff's motion for partial summary judgment on its merits makes it unnecessary to reach the additional reasons advanced by defendants in opposition to said motion.

 In the alternative the plaintiff asks the Court to "ascertain what material facts are in good faith controverted" and to enter "an order specifying the facts that appear without substantial controversy".[21] This question has neither been briefed nor argued. Counsel are directed to confer in an effort to reach an appropriate agreement and stipulation and to advise the Court at their convenience. In the meantime it would appear that the question of "controverted facts" can better be resolved following completion of discovery at a pre-trial conference called for that purpose as to which counsel are requested to advise the Court. Accordingly, we will, at this time, deny, without prejudice, the plaintiff's motion for an order specifying "uncontroverted facts".

oil companies." (Citing Texaco) 393 U.S. at 341, 89 S.Ct. at 514.

**20.** Said motion was granted by our order of March 28, 1969, which will be vacated.

**21.** See paragraph (b) of Prayer in plaintiff's motion (Document No. 36).