[L.A. No. 31839. June 24, 1985.]

E. S. BILLS, INC., Plaintiff and Respondent, v.
DANIEL TZUCANOW et al., Defendants and Appellants.

## COUNSEL

Gregg A. Johnson, Russell M. De Phillips and Milberg, Johnson, De Phillips & Lamson for Defendants and Appellants.

Paul B. Wells, Richard H. Benes, Linda Cory Allen and Procopio, Cory, Hargreaves & Savitch for Plaintiff and Respondent.

Pillsbury, Madison & Sutro, Walter R. Allan, James O'M. Tingle, Bruce McDiamond and Kirk S. Schumacher as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**REYNOSO, J.**—In this unlawful detainer action, defendant lessees appeal from a judgment awarding possession of a gasoline service station, together with back rent and attorney fees, to plaintiff lessor, a petroleum distributor. Code of Civil Procedure section 1174, subdivision (a) (section 1174(a)) provides generally that a petroleum distributor may not recover possession from a gasoline dealer in an unlawful detainer action without establishing good cause under Business and Professions Code section 20999.1 (section 20999.1) for termination or nonrenewal of the gasoline dealer's franchise.[1] The latter section defines "good cause" to include (1) failure to "comply with essential and reasonable requirements of the franchise agreement," (2)

---

[1] The second and third paragraphs of section 1174(a), which took effect January 1, 1978, provide as follows: "Except as provided in Section 1166a, in any action for unlawful detainer brought by a petroleum distributor against a gasoline dealer, possession shall not be restored to the petroleum distributor unless the court in the unlawful detainer action determines that the petroleum distributor had good cause under Section 20999.1 of the Business and Professions Code to terminate, cancel, or refuse to renew the franchise of the gasoline dealer. [¶] In any action for unlawful detainer brought by a petroleum distributor against the gasoline dealer, the court may, at the time of request of either party, require the tenant to make rental payments into the court, for the lessor, at the contract rate, pending the resolution of the action."

failure to "act in good faith in carrying out the terms of the franchise," or (3) "other legitimate business reasons" (with qualifications).[2]

The trial court, sitting without a jury, found that plaintiff terminated defendants' franchise solely because they refused to continue purchasing gasoline at the prices set by plaintiff, thereby violating their written obligation to buy the gasoline at plaintiff's "applicable Dealer Purchase Price." The issue on appeal is whether, in light of (1) sections 1174(a) and 20999.1, and (2) the usually summary nature of unlawful detainer actions, it was error for the trial court to refuse to receive and consider certain evidence offered by defendants to show that plaintiff's prices did not comply with the agreement. We shall conclude that the evidence was admissible, that the error was prejudicial, and that accordingly the judgment must be reversed.

On April 20, 1979, the parties executed a lease and two gasoline purchase agreements by which defendants became the lessees and dealer at plaintiff's service station in Vista (San Diego County), California, selling gasoline that plaintiff supplied under an "independent" brand (Regal) controlled by plaintiff. (Plaintiff was not the refiner of the gasoline.) The lease was for a primary term of one year with an automatic extension of two more years, subject to termination on thirty days' notice by either party. No cash rent was required, but defendants undertook to purchase the gasoline from plaintiff at plaintiff's "applicable Dealer Purchase Price" in effect at the time of sale to defendants' customers. Those arrangements constituted a "franchise" for purposes of section 20999.1.[3]

---

[2]Section 20999.1 was added as of January 1, 1976. As amended effective January 1, 1979 (but prior to further amendment effective Jan. 1, 1982), it provided in pertinent part: "Notwithstanding the terms of any franchise, no franchisor shall terminate, cancel, or refuse to renew any existing franchise without good cause. [¶] As used in this section good cause is limited to the following:

"(a) The gasoline dealer or petroleum distributor failed to comply with essential and reasonable requirements of the franchise agreement;

"(b) the gasoline dealer or petroleum distributor failed to act in good faith in carrying out the terms of the franchise; or

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"(d) For other legitimate business reasons (except that a termination, or cancellation of a franchise for the purpose of enabling the petroleum distributor or manufacturer to assume operation of the distributor's or gasoline dealer's business shall not be considered to be a legitimate business reason unless the gasoline dealer or distributor is paid reasonable compensation for the value of his franchise, including a reasonable amount for goodwill)."

[3]Business and Professions Code section 20999, as adopted along with section 20999.1, effective January 1, 1976, provided until January 1, 1982, as follows:

"As used in this chapter, the term:

"(a) 'Petroleum distributor' means any person engaged in the sale, consignment, or distribution of petroleum products to retail outlets which it owns, leases, or otherwise supplies.

"(b) 'Gasoline dealer' means any person engaged in the retail sale of petroleum products in this state under a franchise or contractual agreement entered into with a petroleum dis-

Defendants operated the station as a family business from April 20, 1979, the date of the lease, until November 15, 1981, just before the date set by the trial judge for the plaintiff's retaking possession. In mid-1980 there was a sharp drop in defendants' gasoline sales and gross profits, and defendants' counsel wrote to plaintiff complaining of the latter's "pricing practices." Defendants' sales did not improve, and in April 1981 they filed a superior court action against plaintiff and two of its officers, seeking damages for breach of contract, treble damages for violation of the antitrust laws, and a declaration that the plaintiff's "applicable Dealer Purchase Price" specified in its agreement with defendants meant a wholesale price consistent with prices at which other distributors in the area sold to gasoline dealers.[4]

On June 8, 1981, defendants' counsel wrote to plaintiff, protesting that plaintiff was charging defendants more for gasoline than it charged the public at its own stations. The letter asserted that the "applicable Dealer Purchase Price" which defendants had contracted to pay for gasoline was "a reasonable wholesale or distributor price to be set by [plaintiff]" and cited the following provisions of the California Uniform Commercial Code as pertinent to the determination of the price: A price to be fixed by the seller means one fixed in good faith (§ 2305, subd. (2)) and in accordance with

---

tributor.

"(c) 'Franchise' means any agreement between a petroleum distributor and a manufacturer or between a gasoline dealer and a petroleum distributor under which the petroleum distributor or the gasoline dealer is granted the right to use a trademark, trade name, service mark, or other identifying symbol or name owned by the manufacturer or distributor, or an agreement between a petroleum manufacturer or distributor or dealer under which the petroleum distributor or the gasoline dealer is granted the right to occupy premises owned, leased, or controlled by the other party to the agreement, for the purpose of engaging in the retail or wholesale sale of petroleum products."

As of January 1, 1982, the foregoing section 20999 was replaced by similar but more elaborate provisions in a new section of the same number. Had the parties' contractual arrangement been entered into after that date, provisions in the new section specifying control of the trademark by the "refiner" as a component of a "franchise" would raise questions, not presented here, about the applicability of sections 1174a and 20999.1. (See fn. 4, *post*.)

[4]We are advised by counsel that this action later was voluntarily dismissed and refiled in a federal district court, which dismissed a portion of the complaint that claimed relief under the federal Petroleum Marketing Practices Act (15 U.S.C. § 2801 et seq.) (PMPA). The parties agree that the PMPA did not apply to their contractual arrangement because the trademark under which defendants were required to market the gasoline supplied by plaintiff was not owned or controlled by the *refiner,* and therefore the arrangement did not constitute a "franchise" under PMPA section 101(1) (15 U.S.C. § 2801(1)).

Plaintiff contends, however, that because the PMPA has been held to preempt certain portions of California's section 20999.1 (*California Arco Distributors, Inc.* v. *Atlantic Richfield Co.* (1984) 158 Cal.App.3d 349 [204 Cal.Rptr. 743]), that section should be deemed inoperative here. The contention is meritless, "for if the PMPA has no applicability to this case then no issue of preemption is presented" (*id.,* at p. 365). PMPA itself provides for preemption of state law only "[t]o the extent that any provision of this subchapter applies to the termination . . . of any franchise, or to the nonrenewal . . . of any franchise relationship." (15 U.S.C. § 2806(a).)

reasonable commercial standards of fair dealing in the trade (§ 2103, subd. (1)(b)); and in determining the price of goods regularly sold in an established commodity market, price quotations in official or trade journals or in generally circulated newspapers or magazines are admissible in evidence (§ 2724). The letter then stated that as of June 19, 1981, defendants would purchase plaintiff's gasoline at the "current Arco rack price," as reported in the Lundberg letter, plus 2 cents per gallon to cover plaintiff's delivery costs and profit. (A "rack price" generally is understood to mean the price charged by the refiner for delivery in tanker-load lots.)

On June 19, defendants refused to purchase more gasoline from plaintiff except on the terms stated in that letter, and plaintiff refused to sell except at its own dealer purchase prices. On June 23, defendants commenced purchasing gasoline from another supplier, whereupon plaintiff served them with a notice that its gasoline purchase agreement with defendants was immediately terminated, and that the lease would be terminated in 30 days. Defendants continued to operate the station, selling gasoline obtained from the other supplier, until November 15.

On July 29, 1981, plaintiff commenced the present unlawful detainer action, alleging, inter alia, that there were "good cause and legitimate business reasons" to terminate the lease. Defendants denied that allegation and pleaded as an affirmative defense that plaintiff did not have good cause for termination within the meaning of sections 1174 and 20999.1, "as this action was brought in retaliation for Defendants' exercise of their rights in a separate superior court action."

At the trial, which was held on November 5 and 9, 1981, the parties submitted a written stipulation establishing the foregoing facts. The principal issue tried, with respect to plaintiff's right to repossession, was whether defendants had given plaintiff good cause to terminate their franchise by refusing to pay plaintiff's "applicable Dealer Purchase Price" within the meaning of the contract. Defendants contended that plaintiff had demanded illegally excessive prices in order to drive them out of business and enable plaintiff to operate the station directly. Early in the trial the court announced that on that issue defendants would be allowed to introduce evidence only of (1) dealings between the parties and (2) prices that plaintiff charged other lessee-dealers selling independent-brand gasoline.[5] Plaintiff's vice-president, Robert Bills, testified that there were only four such other dealers, all situated in Long Beach (some 70 miles from where defendants' station was

---

[5] A "Dealers Sale and Security Agreement," one of the two gasoline purchase agreements executed by the parties along with the lease, provided that defendants would buy gasoline at plaintiff's "posted delivered price for each grade of gasoline in effect for the date, the buyer's class of trade and the marketing area in which the buyer's service station is located."

located), and that plaintiff charged defendants less for gasoline than it charged those other dealers, because defendants were "in a little more competitive area than the other stations were." Defendants were allowed to cross-examine Bills on how plaintiff assessed the "competitive" nature of defendants' situation and on other factors, such as plaintiff's costs, taken into account in setting the prices charged defendants.

Objections were sustained, however, to the following other evidence offered by defendants to show that the prices plaintiff charged were excessive: (1) retail gasoline prices at stations operated directly by plaintiff (which defendants claimed were less than the dealer prices plaintiff charged defendants); (2) prices charged a large-volume consumer (also claimed to be lower than prices charged defendants); (3) a published Lundberg report showing refinery prices on June 19, 1981; (4) prices for gasoline furnished to major-branded stations operated by plaintiff or its lessee-dealers (examples of major brands being Shell, Chevron, and Texaco); (5) profits of the lessee who had operated the station just prior to defendants' lease; (6) one defendant's opinion of the reasons for the station's decline in business in 1980; and (7) plaintiff's awareness of the retail prices charged by defendants' competitors. The trial court's position, distilled from numerous statements explaining its rulings, appears to have been that defendant could not assert that plaintiff's prices were excessive, as a defense in this unlawful detainer action, except by showing either (1) that plaintiff charged defendants more than it charged other dealers similarly situated or (2) that plaintiff set the prices with intent to drive defendants out of business and take over the station. In the absence of such discrimination or predatory intent, in the trial court's view, illegally excessive prices might well give defendants a cause of action for damages but would not entitle them to retain possession of the station while refusing to purchase their gasoline from plaintiff at plaintiff's prices.

Underlying the trial court's position was an understandable concern for the summary nature of unlawful detainer proceedings. ■ Because the purpose of such proceedings is timely restoration of possession, issues extrinsic to the possessory right are generally excluded even though they otherwise arise out of the subject matter of the action. (*Green* v. *Superior Court* (1974) 10 Cal.3d 616, 632-634 [111 Cal.Rptr. 704, 517 P.2d 1168].) A defense of retaliatory eviction is permitted "if on balance, the public policies furthered by protecting a tenant from eviction outweigh the state's interest in ensuring that unlawful detainer proceedings are truly summary." (*Barela* v. *Superior Court* (1981) 30 Cal.3d 244, 250 [178 Cal.Rptr. 618, 636 P.2d 582]; accord, *S.P. Growers Assn.* v. *Rodriguez* (1976) 17 Cal.3d 719, 728-729 [131 Cal.Rptr. 761, 552 P.2d 721].) Thus, prior to enactment of section 20999.1 and the pertinent provisions of section 1174(a), it was

held in *Union Oil Co.* v. *Chandler* (1970) 4 Cal.App.3d 716 [84 Cal.Rptr. 756], that a service station operator could not assert as a defense in an unlawful detainer action that the lessor oil company was terminating the lease because of the lessee's refusal to participate in a price-fixing scheme prohibited by the antitrust laws. The Court of Appeal explained: "When we weigh the complex and protracted nature of antitrust cases in the light of the adequate remedies and damages afforded an aggrieved party in such cases against the interest in preserving the summary nature of an unlawful detainer action, we believe the latter to be of paramount importance." (*Id.*, at p. 726.)

■ In the present case, however, the lack of good cause under section 20999.1 to terminate a gasoline dealer's franchise is not simply a defense to be balanced against the policy of preserving the summary nature of unlawful detainer proceedings. Instead, section 1174(a) now includes the existence of such good cause as a prerequisite to an unlawful detainer judgment for restoration of a defendant gasoline dealer's premises to a plaintiff petroleum distributor. Thus, the issue now determinative of plaintiff's right to repossession was joined in the pleadings not by the defendants' retaliatory eviction defense but by the complaint's allegation of good cause for termination, and the denial of that allegation in the answer.[6]

We should endeavor to apply those provisions of section 1174(a) in a way that will best carry out the policies of section 20999.1 that the amendment to section 1174(a) was designed to implement. In enacting section 20999.1, the Legislature expressly declared the public interest in preventing disruption in the marketing of gasoline.[7] The amendments to section 1174(a) seem intended to assure the gasoline dealer of a day in court on the merits of the dealer's and distributor's respective rights under the franchise before the distributor is allowed to retake possession of the service station. The amend-

---

[6]Because the present lease and franchise were executed on April 20, 1979, subsequent to the effective dates of section 20999.1 and the pertinent provisions of section 1174(a) (see fns. 1, 2 *ante*), we need not consider the questions of their retroactive effect addressed in *Mobil Oil Corp.* v. *Rossi* (1982) 138 Cal.App.3d 256 [187 Cal.Rptr. 845]; *Witt* v. *Union Oil Co.* (1979) 99 Cal.App.3d 435 [160 Cal.Rptr. 285]; *Union Oil Co.* v. *Moesch* (1979) 88 Cal.App.3d 72 [151 Cal.Rptr. 517]; and *Mobil Oil Corp.* v. *Handley* (1978) 76 Cal.App.3d 956 [143 Cal.Rptr. 321].

[7]The statute that first enacted section 20999.1 contained this additional provision: "The Legislature finds and declares that distribution and sales through franchise arrangements of gasoline in the State of California affects the general economy of the state, the public interest and the public welfare. Competition and nondiscriminatory practices are essential to the fair and efficient functioning of a free market economy. Gasoline and other petroleum products should be marketed in the manner most beneficial to the consumer, and to prevent the disruption of vital energy sources. To prevent such disruptions it is necessary to define the relationships and responsibilities of parties to gasoline franchise agreements, and provide a remedy to gasoline dealers whose franchises are terminated, or not renewed." (Stats. 1975, ch. 640, § 2.)

ments contain two safeguards for the petroleum distributor: First, the right to a writ of possession against an absent or inaccessible defendant upon the filing of an undertaking (Code Civ. Proc., § 1166a) is expressly preserved. Second, the court may "require the tenant to make rental payments into the court, for the lessor, at the contract rate, pending the resolution of the action" (§ 1174(a)). Apart from those two safeguards, neither of which was invoked here, section 1174(a) directs that in unlawful detainer proceedings by petroleum distributors against gasoline dealers, the ordinarily summary nature of the unlawful detainer proceeding must give way to the policy of assuring that the petroleum distributor indeed had good cause for terminating the franchise.

The trial court concluded that plaintiff had such good cause. The issue here is whether the evidence from which it reached that conclusion was erroneously and prejudicially restricted.

The key findings on plaintiff's reasons for terminating defendants' franchise are these: "9. Plaintiff served defendants with the notice of termination because defendants refused to purchase any more gasoline from plaintiff at plaintiff's Dealer Purchase Price. [¶] 10. Plaintiff did not terminate or seek to terminate defendants' lease or supply agreement for any reason other than defendants' refusal to continue to purchase gasoline from plaintiff. . . ." Those findings provide crucial support for the trial court's conclusions that plaintiff had good cause for termination in that defendants "failed to comply with essential and reasonable requirements of the franchise agreement" and "failed to act in good faith in carrying out the terms of the franchise" (see § 20999.1, subds. (a), (b)).[8]

---

[8]The court also concluded that plaintiff had "other legitimate business reasons" for terminating the franchise, but the findings do not support a conclusion that plaintiff had any reason other than defendants' refusal to buy plaintiff's gasoline at plaintiff's applicable dealer purchase price.

Plaintiff argues that defendants' purchases of gasoline from an alternate supplier, following the breakdown in agreement on the propriety of the price being charged by plaintiff, was an additional reason for termination because such purchases violated defendants' contractual obligation to "sell all gasoline supplied hereunder under brands, trademarks and names supplied by [plaintiff] without adulteration." But there is no evidence that defendants passed off gasoline from the other supplier under plaintiff's brand name; further, plaintiff's formal notice of termination specified as a reason only defendants' failure to purchase gasoline from plaintiff at plaintiff's applicable dealer purchase price.

The stipulation of facts, submitted at the trial, states that defendants operated a flower shop on the premises beginning August 1, 1980, from which they netted about $1,400 per year. Plaintiff argues that that operation violated the provision in paragraph 6 of the lease that "Lessee acknowledges that said premises are leased for the sole and exclusive purpose of conducting thereon a gasoline service station business and that said premises shall not be used for any other purpose without lessor's written consent." But there is no evidence that the flower-shop operation, even if it be deemed to have given rise to a legally sufficient reason for termination of the franchise under section 20999.1, subdivision (c), was ever invoked by plaintiff as a reason for terminating the lease.

The evidence excluded by the trial court was relevant to those findings in that it was probative of whether the prices plaintiff was charging defendants for each grade of gasoline complied with plaintiff's contractual obligation to charge its "applicable Dealer Purchase Price." The contract must be interpreted in light of the following provisions of the California Uniform Commercial Code: "A price to be fixed by the seller or by the buyer means a price for him to fix in good faith." (§ 2305, subd. (2).) " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." (§ 2103, subd. (1)(b).) " 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . ." (§ 2104, subd. (1).)

Defendants' theory was that under prevailing marketing conditions, and in light of the statutory standards, plaintiff was required to charge prices that would enable defendants to compete with other stations in the area and earn a reasonable profit. The trial court erroneously excluded evidence offered to support that theory. Thus, defendants were not permitted to show the retail prices charged at the service stations operated directly by plaintiff, or the prices charged by plaintiff to a large-volume consumer, even in the face of defendants' offers of proof in both instances that the prices in question were less than those that plaintiff was charging defendants. Also excluded was a published Lundberg report of current refiner's prices (seemingly admissible under Cal. U. Com. Code, § 2724). The court further excluded evidence of wholesale prices charged by the suppliers of major-brand gasoline to other stations owned or operated by plaintiff, of the profitability of defendants' station under their predecessor, of the reasons for the station's decline in business, and of plaintiff's awareness of retail prices charged by defendants' competitors. All of this excluded evidence seems relevant to whether plaintiff fixed the prices charged defendants in accordance with reasonable commercial standards of fair dealing in the trade.

The trial court recognized the relevance of the excluded evidence to the issue of whether plaintiff's prices accorded with the contract yet deemed it not relevant to plaintiff's right to repossession of the service station. That view was incorrect. If plaintiff failed to offer defendants gasoline except at prices in excess of those permitted by the contract, defendants' refusal to purchase the gasoline at those prices was neither a "fail[ure] to comply with essential and reasonable requirements of the franchise agreement" nor a "fail[ure] to act in good faith in carrying out the terms of the franchise" (§ 20999.1, subds. (a), (b)). In that event, there was no showing of good cause for terminating the franchise, and section 1174(a)'s prerequisites for restoring possession to plaintiff petroleum dealer were not met.

Plaintiff contends that defendants are precluded from complaining about plaintiff's prices at the time of their refusal to purchase because (as found by the trial court) on June 8, 1981, defendants informed plaintiff that as of June 19, they would purchase plaintiff's gasoline only at 2 cents per gallon over published Arco "rack" prices. According to plaintiff the prices specified by defendants were unreasonably low.[9] But the contract gave plaintiff, not defendants, the right and duty of setting the prices to be paid by defendants, so that the question of good cause turns primarily, if not wholly, on the propriety of plaintiff's prices. If those prices were proper, defendants would be in breach, and there would be good cause to terminate the franchise, regardless of whether defendants counteroffered a lower price or responded with a flat refusal to purchase from plaintiff. On the other hand, if plaintiff's prices were too high to conform to the contract, a notice by defendants that they would pay only prices that were too low to conform would not necessarily put defendants in breach, at least in the absence of reliance by plaintiff sufficient to excuse plaintiff's failure to tender proper performance.

The trial court erroneously excluded evidence that was crucial to defendants' ability to disprove the good cause requisite to a judgment for plaintiff under sections 1174(a) and 20999.1. Accordingly, the judgment is reversed.

Kaus, J., Broussard, J., Grodin, J., and Lucas, J., concurred.

**MOSK, J.**—I concur.

The majority opinion reaches the correct result on the issues raised and discussed. My concern, however, has been with the validity of Business and Professions Code section 20999.1. If the section is constitutionally infirm it would have no effect whatever on this unlawful detainer action.

Section 20999.1 provides, in substance, that no petroleum refiner or distributor franchisor "shall terminate, cancel, or fail to or refuse to renew any existing franchise without good cause," and defines "good cause" to mean: (a) the franchisee has failed to comply with essential and reasonable requirements of the franchise agreement; (b) the franchisee has failed to act in good faith toward the franchisor; (c) the franchisor is withdrawing from the franchisee's marketing location; and (d) any other legitimate business reason, provided that if the franchisor terminates, cancels, or fails or refuses to renew in order to assume operation of the franchisee's business, the

---

[9]The trial court found that plaintiff's overhead and administrative costs exceeded 2.5 cents per gallon but did not make a finding on the prices paid by plaintiff to acquire the gasoline furnished defendants. Plaintiff's vice president testified that plaintiff did pay the Arco rack price, but defendants assert in their briefs that the published rack price was often discounted.

franchisor must pay the franchisee reasonable compensation for the value of the franchise. At the present time 24 other states have statutes similar to section 20999.1. (15 Glickman, Business Organizations: Franchising (1985) § 3.03[1] at pp. 3-28-3-29, and statutes cited.)

"Good cause" statutes such as section 20999.1 spring from the economic and social importance of franchising in the United States and the potential and actual abuses associated with this business relationship.

Franchising combines the efficiencies of big business at the national or regional level (e.g., economies of scale and access to capital) with the efficiencies of small business at the local level (e.g., the ability to quickly determine and respond to customers' desires). (See *Ungar* v. *Dunkin' Donuts of America, Inc.* (3d Cir. 1976) 531 F.2d 1211, 1222-1223, cert. den., 429 U.S. 823 [50 L.Ed.2d 84, 97 S.Ct. 74]; Brown, Franchising: Realities and Remedies (1982) § 7.04[1]-[2] at pp. 7-31-7-34 [hereafter Brown].) Franchising also decreases economic concentration in integrated enterprises and—as franchisors invariably claim in their marketing efforts—allows individuals who otherwise would not have been able to become independent businessmen to do so. (See *Ungar, supra,* at pp. 1222-1223; *Brown, supra,* § 1.01[2] at p. 1-3.) The franchisee, as it has been recognized, develops goodwill for the franchise through the investment of his time, labor, and money. (See, e.g., *Milsen Company* v. *Southland Corporation* (7th Cir. 1971) 454 F.2d 363, 366.) Not surprisingly then, his interest in the goodwill of his franchise in his own locality has achieved recognition under the common law (see, e.g., *Shell Oil Co.* v. *Marinello* (1973) 63 N.J. 402 [307 A.2d 598, 601-602, 67 A.L.R.3d 1291] cert. den. (1974) 415 U.S. 920 [39 L.Ed.2d 475, 94 S.Ct. 1421]), and under statutes (see, e.g., Bus. & Prof. Code, § 20000 et seq.; Corp. Code, §§ 31101, 31119, 31125).

Franchising, I note in passing, has become a significant economic phenomenon. In 1980, for example, franchised businesses had only recently recovered from a severe slump—and nevertheless accounted for $385 billion in annual sales, 24 percent of the GNP, and 38 percent of all retail sales in the United States. *(Brown, supra,* § 1.01[1] at p. 1-2, citing U.S. Dept. of Commerce (1980) Franchising in the Economy 1979-1981.)

Franchising involves the unequal bargaining power of franchisors and franchisees and therefore carries within itself the seeds of abuse. Before the relationship is established, abuse is threatened by the franchisor's use of contracts of adhesion presented on a take-it-or-leave-it basis. (See, e.g., *Ungar, supra,* 531 F.2d at pp. 1222-1223; *Semmes Motors, Inc.* v. *Ford Motor Company* (2d Cir. 1970) 429 F.2d 1197, 1207; see generally Note, *Fairness in Franchising: The Need for a Good Cause Termination Require-*

*ment in California* (1980) 13 U.C. Davis L.Rev. 780, 785, fn. 18, and authorities cited [hereafter *Good Cause Termination Requirement*].) Indeed, such contracts are sometime so one-sided, with all the obligations on the franchisee and none on the franchisor, as not to be legally enforceable. (Brown & Cohen, *Franchising: Constitutional Considerations for "Good Cause" State Legislation* (1978) 16 Hous.L.Rev. 21, 33 [hereafter Brown & Cohen].) After the relationship is established, abuse is threatened by the very nature of franchise agreements as contracts of adhesion: "[T]hey contain provisions which are extremely difficult for franchisees to comply with. The result is that franchisees are constantly in peril of non-compliance . . . ." (*Good Cause Termination Requirement, supra,* at p. 785, fn. 19; see, e.g., *FTC* v. *Texaco* (1968) 393 U.S. 223, 226-229 [21 L.Ed.2d 394, 397-399, 89 S.Ct. 429].) The seeds of abuse, moreover, have not remained dormant: abuse has sprung up, and sprung up often. (E.g., *Good Cause Termination Requirement, supra,* at p. 781, fn. 4, and authorities cited; see, e.g., *Ungar, supra,* 531 F.2d at p. 1222.)

Set against this background, the purpose of good cause legislation, such as section 20999.1, is manifestly to protect the franchisee's interest in his business without denying the franchisor the right to terminate, cancel, or fail or refuse to renew when he has legitimate business reasons to do so. (See, e.g., *Brown, supra,* § 7.04[1]-[2] at pp. 7-31–7-34.) Such protection has not effectively been provided by substantive legal remedies. (E.g., *Good Cause Termination Requirement, supra,* 13 U.C. Davis L.Rev. at pp. 788-803.)

Section 20999.1, like other state good cause statutes, is subject to scrutiny under the contracts clause (U.S. Const., art. I, § 10, cl. 1), the supremacy clause (*id.,* art. VI, cl. 2), the due process clause (*id.,* Amend. XIV, § 1), the equal protection clause (*ibid.*), and the commerce clause (*id.,* art. I, § 8, cl. 3). The provision appears to survive scrutiny under each clause.

First, section 20999.1 appears not to impair the obligation of contracts. Such a conclusion follows when, as here, the statute is given prospective effect. (*Union Oil Co.* v. *Moesch* (1979) 88 Cal.App.3d 72, 77-78 [151 Cal.Rptr. 517]; accord, *Phillips Petroleum Co.* v. *Paradee Oil Co., Inc.* (Del. 1975) 343 A.2d 610, 611-612.) Such a conclusion, moreover, is arguably not barred even if the statute is given retroactive effect. Although the weight of authority is against the permissibility of retroactive application (e.g., *Mobil Oil Corp.* v. *Handley* (1978) 76 Cal.App.3d 956, 964-965 [143 Cal.Rptr. 321]; accord, *Globe Liquor Co.* v. *Four Roses Distillers Company* (Del. 1971) 281 A.2d 19, 21, cert. den., 404 U.S. 873 [30 L.Ed.2d 117, 92 S.Ct. 103]), better reasoned analysis would allow such application, at least in some situations (*Good Cause Termination Requirement, supra,* 13

U.C. Davis L.Rev. at p. 783, fn. 12 ["Retroactive application alone should not be sufficient to invalidate the legislation. Retroactivity is only one factor the court considers in determining whether the state has unconstitutionally impaired an existing contract. [Citations.] One could argue that when a good cause requirement is applied to existing contracts it is not a retroactive impairment of contracts but merely the reasonable regulation of an ongoing business relationship. *Cf.* New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 106 (1978) (California's regulation of the number of automobile franchises in an area upheld as a reasonable state regulation of a business relationship)."]; Brown & Cohen, *supra,* 16 Hous.L.Rev. at pp. 51-53 ["Although 'good cause' legislation may be couched in the language of agreements, such statutes are more the regulation of competition than a contractual proscription." (Fn. omitted.)]).

Second, section 20999.1 appears not to be preempted by any federal law dealing with its subject matter broadly defined. As the parties agree and the majority opinion correctly concludes, the Petroleum Marketing Practices Act (15 U.S.C. § 2801 et seq.) is not preemptive. Further, the Lanham Act (*id.,* § 1051 et seq.), the federal trademark law, is not preemptive. (E.g., *C. A. May Marine Sup. Co.* v. *Brunswick Corp.* (5th Cir. 1977) 557 F.2d 1163, 1167; *Mariniello* v. *Shell Oil Company* (3d Cir. 1975) 511 F.2d 853, 856-859.) Finally, the federal antitrust laws are not preemptive. (See *In re Clark Oil & Refining Corp., etc.* (E.D.Wis. 1977) 422 F.Supp. 503, 516 [approval of master settlement agreement providing for, inter alia, termination only for cause].)

Third, section 20999.1 appears not to violate the due process clause. The statutory standard of good cause is not impermissibly vague. (E.g., *C. A. May Marine Sup. Co.* v. *Brunswick Corp., supra,* 557 F.2d at p. 1167 [claim is "patently frivolous"]; *Globe Liquor Co.* v. *Four Roses Distillers Company, supra,* 281 A.2d at pp. 21-22 [upholding against a void-for-vagueness attack a statute that merely provided that a failure to renew is unjust if made "without good cause or in bad faith," without defining either phrase].) Further, it is within the police power of the Legislature to protect franchisees from the arbitrary exercise of the right to terminate, cancel, or fail or refuse to renew on the part of franchisors. (Cf. *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.* (1978) 439 U.S. 96, 106-108 [58 L.Ed.2d 361, 373-375, 99 S.Ct. 403] ["the California Legislature was empowered to subordinate the franchise rights of automobile manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices"].)

Fourth, section 20999.1 appears not to violate the equal protection clause. In light of the Legislature's not unreasonable finding and declaration of the

necessity of the legislation in question (Stats. 1975, ch. 640, § 2, p. 1390), the classifications made do not appear to "do[] violence to common sense" and thus do not contravene the equal protection clause. (*Globe Liquor Co.* v. *Four Roses Distillers Company, supra,* 281 A.2d at p. 23 [statute limiting coverage to wholesaler-franchisees and to retailer-franchisees dealing in no more than three trademark or trade name products held not violative of the equal protection clause].)

Finally, section 20999.1 appears not to violate the commerce clause. (Cf. *Exxon Corp.* v. *Governor of Maryland* (1978) 437 U.S. 117, 125-129 [57 L.Ed.2d 91, 99-102, 98 S.Ct. 2207] [upholding against a commerce-clause attack a state statute prohibiting oil companies from operating gasoline stations or other retail outlets: although the statute has the effect of making a major change in the distribution system of an interstate industry, it neither discriminates against interstate goods nor favors local producers or refiners and thus does not unduly burden interstate commerce].)

For the foregoing reasons, I conclude that section 20999.1 is valid. Therefore I agree with the majority that the judgment should be reversed.

Bird, C. J., concurred.

Respondent's petition for a rehearing was denied August 1, 1985.